[No. 2702. Jan. 28, 1924.]

[Rehearing Denied Aug. 16, 1929.]

ODELL et al. v. COLMOR IRRIGATION & LAND CO.

[280 Pac. 398.]

S. J. Sackett, H. L. Bickley, and H. A. Kiker, all of Raton, for appellant.

Crampton, Phillips & Darden, of Raton, for appellees.

## OPINION OF THE COURT

BRATTON, J. This suit was instituted by the Odell Bros. Construction Company, a copartnership, against the Colmor Irrigation & Land Company, a corporation. For convenience, the former will be referred to throughout as the plaintiff, while the latter will be referred to as the defendant.

On May 4, 1918, the parties entered into a written contract whereby the plaintiff was employed to construct for the defendant a certain intake canal of the Lake Charette irrigation system, to belong to the defendant and to be situated in Colfax county. This contract contained the following provisions with regard to the duty and authority of the engineer to be in charge of such work:

"When the word 'engineer' is used herein it shall mean Bartlett & Ramney, Inc., and their duly authorized assistants limited to the particular duties entrusted to them.

"All the work shall be done to the satisfaction of the engineer who shall in all cases determine the amount, quality, acceptability, and fitness of the several amounts of work, materials and equipment.

"The engineer shall have the final decision on all matters of dispute involving the character of work, the compensation to be made therefor, or any question arising under this contract, and his decision shall be final and binding on both parties to this contract."

The materials to be excavated in the construction of such intake canal were divided into four classes, the provisions of the contract with reference to such classification being as follows:

"Materials on all canals and ditches, will be classified in accordance with the following definitions:

"Class 1. Material shall comprise all material which can be plowed with a strong ten (10) inch grading plow, well handled, behind a good six (6) mule or horse team.

"Class 2. Material shall comprise: First, hard shale or soapstone lying in its original or stratified position, coarse boulders in gravel, cemented gravel, hardpan, or any other material requiring

in the judgment of the engineer, the use of pick and bar, or which cannot be plowed with a strong ten (10) inch grading plow, well handled behind a good six (6) mule or horse team. It is to be understood that the plowing test shall apply to all materials named herein, and that only such material is entirely loose rock, which, in the judgment of the engineer, it is impracticable to plow at all with a strong ten (10) inch grading plow, well handled behind a good six (6) mule or horse team. Any material in which a portion of a days work in plowing can be done with a strong ten (10) inch grading plow, well handled behind a good six (6) mule or horse team, will be classified as a percentage of class 1 and a percentage of class 2, the amount of such percentages to be finally determined by the engineer. Second, detached rock or boulders in masses exceeding one and one-half (1½) cubic feet and less than one cubic (1) yard.

"Class 3. Material shall comprise: First, rock in solid beds or masses in its original or stratified position. Second, boulders or detached masses of rock exceeding one (1) cubic yard, and all other material which in the judgment of the engineer cannot be removed without continuous drilling and blasting and which is as difficult and expensive to remove as solid limestone or sandstone. The fact that blasting may be resorted to by the contractor, or may be the most economical means of working a material, will not of itself entitle such material to be classed as class 3 material. Class 3 material shall not comprise 'malpais' or Basalt rock.

"Class 4. Material shall comprise solid beds or masses of 'malpais' or basalt rock in its original position or in detached masses exceeding one (1) cubic yard. The company may omit class 4 materials at its option from the work to be done.

"Compacted embankments or plowing of natural surface below spoil banks will be force account work. The force account in case of compacting embankment or hauling material as ordered shall cover in addition to cost of the said work itself the cost to contractor of delay to steam shovel if there be any."

By the further terms of the contract, the prices to be paid for the respective materials so excavated were: For all in class 1, 20 cents per cubic yard; for all in class 2, 60 cents per cubic yard; for all in class 3, $1.25 per cubic yard; and for all in class 4, $3 per cubic yard.

Plaintiff charged in its first amended complaint: That it had performed all of its obligations under the terms of the contract, and had completely constructed such intake canal in accordance with and as required by its provisions. That after such completion, John S. Fenner, the resident engineer, had prepared a final estimate required by the terms of such contract, which purported to show the quantities of materials in each class excavated and

moved by the plaintiffs, as well as the prices to be paid and received therefor, and that such final estimate had been adopted and approved by the chief engineer, Terrill Bartlett, who had acted upon behalf of Bartlett & Ranney, Inc. That such final estimate showed that plaintiff had excavated 61,328 cubic yards of material in class 1; 2,127 cubic yards in class 2; 1,948 cubic yards in class 3, and 5,539 cubic yards in class 4; whereas, there were actually 49,284.6 cubic yards of material in class 1; 7,506 cubic yards in class 3; 4,606.3 cubic yards in class 3, and 9,363.2 cubic yards in class 4. That such final estimate was not based upon actual and correct classifications made in good faith by a competent engineer and competent assistants, in the exercise of an honest judgment, but that said engineer and his assistants had willfully, knowingly, fraudulently, in bad faith, and with the intent, purpose, and design to decrease the amount which the defendant would be required and compelled to pay under the terms of such contract, and without regard to the rights of the plaintiff, so wrongfully and erroneously measured and classified such materials. Plaintiff further alleged that the amount yet due and unpaid according to the work actually done and the materials actually excavated was $17,480.53.

It further pleaded that it had furnished materials and performed labor upon what was termed a "force account" to the extent of $1,464.60, of which $272.32 remained unpaid. It prayed that the final estimate of the engineer be vacated and set aside; that the true amount due the plaintiff be determined and judgment rendered therefor.

The defendant answered with certain admissions and denials and pleaded specifically the above quoted provision of the contract with regard to the decision of the engineer being final and binding upon both parties. It tendered the amount still due according to the final estimate of the engineer, which had been previously refused by the plaintiff. It further pleaded an overpayment of $222.05, which occurred through mistake of the resident engineer, for which it sought a credit, and by way of cross-complaint it sought to recover $186 for certain articles of personal property which it had sold to the plaintiff.

After defendant's demand for a jury trial, and its request for a postponement of the case had each been denied, a trial was had before the court which resulted in a finding that the final estimate had not been founded upon actual and correct classifications, made in good faith by a competent engineer and in the exercise of an honest judgment; that said engineer made gross mistakes and errors in the classification and computation of the amount of yardage of the various materials excavated by the plaintiff, upon which findings the trial court concluded as a matter of law that such final estimate should be vacated and canceled. Judgment was rendered in plaintiff's favor in the sum of $13,385.09, from which this appeal was seasonably perfected.

Many questions have been thoroughly discussed by counsel for the respective parties, and they are to be complimented upon the exhaustive manner in which, and the zeal with which, the case has been presented. Our conclusion upon one of these questions renders it unnecessary to discuss or determine the remaining ones.

It is urged by the defendant that the evidence is insufficient to overcome the decision of the engineer to whom the right and power of settling disputes which might arise between the parties from time to time was committed by the terms of the contract. The record is extremely long; it consists of more than 1,000 pages, and yet we have repeatedly read the same in order that we might correctly determine this question. From such careful and prolonged consideration we are convinced that the defendant is correct in this contention. There is no moral rule, nor reason of public policy, which prevents contracting parties from inserting in such contracts a provision by which all disputes which may arise between them from time to time during the execution of such contract may be submitted to some third person, whose judgment and determination shall be binding upon them, as the parties are dealing at arm's length with each other and have the right to so bind and obligate themselves.

From an examination of this contract, we must presume that the parties realized at the time they entered

into it that such disputes would arise between them, and that the engineer might err in his determination of such matters; that in order to provide a forum within which such disputes might be speedily determined, they agreed upon such engineer as their umpire. Neither party reserved the right to revise his determination of such questions for mere errors or mistakes on his part, but, rather, they chose to make such decision final and binding upon them. Under such circumstances, mere errors or mistakes on the part of such engineer with regard to the kind, class, or quantities of materials excavated by the contractor are insufficient to warrant a court of equity in vacating and setting aside his decision. There must be fraud, or such gross mistakes which necessarily imply bad faith, or the failure on the part of such engineer to exercise an honest judgment with regard to such matters. The mistakes must be so gross as to clearly indicate that such engineer has acted consciously unjust in the discharge of the duties imposed upon him, and has thereby violated the rights of the complaining party. Mundy v. Louisville & N. Ry. Co., 67 F. 633, 14 C. C. A. 583; Elliott v. M., K. & T. Ry. Co., 74 F. 707, 21 C. C. A. 3; Choctaw & M. Ry. Co. v. Newton, 140 F. 225, 71 C. C. A. 655; Cook v. Foley, 152 F. 41, 81 C. C. A. 237; Memphis Trust Co. et al. v. Brown-Ketchum Iron Works, 166 F. 398, 93 C. C. A. 162; Martinsburg & Potomac Ry. Co. v. March, 114 U. S. 549, 5 S. Ct. 1035, 29 L. Ed. 255; Chicago, Santa Fe & California Ry. Co. v. Price, 138 U. S. 185, 11 S. Ct. 290, 34 L. Ed. 917; Vanderwerker et al. v. Vermont Cent. Ry. Co., 27 Vt. 130; Hot Springs R. Co. v. Maher, 48 Ark. 522, 3 S. W. 639; Ark-Mo Zinc Co. v. Patterson, 79 Ark. 506, 96 S. W. 170; Carlile, Corrigan & Dunn v. Corrigan, 83 Ark. 136, 103 S. W. 620; Williams et al. v. Chicago, S. F. & C. Ry. Co. et al., 153 Mo. 487, 54 S. W. 689; Rialto Const. Co. v. Reed, 17 Cal. App. 29, 118 P. 473; Mercantile Trust Co. v. Hensey, 205 U. S. 298, 27 S. Ct. 535, 51 L. Ed. 811, 10 Ann. Cas. 572, and the voluminous notes thereto appended.

In Mundy et al. v. Louisville & N. Ry. Co., supra, the court, in speaking through Circuit Judge Taft, said:

"The authorities leave no doubt that construction contracts, in which the contractor stipulates that the engineer or architect of the owner shall finally and conclusively decide, as between him and the owner, what amount of work has been done, and its character, and the amount to be paid therefor under the contract, are legal, and should be enforced. In such cases, after the work has been done, the contractor can recover nothing in excess of the amount found due by the engineer, unless he can make it appear that the engineer's decision was fraudulently made, or was founded on palpalable mistake."

The Supreme Court of the United States, in Martinsburg & Potomac Ry. Co. v. March, supra, through Mr. Justice Harlan, declared:

"We are to presume from the terms of the contract that both parties considered the possibility of disputes arising between them in reference to the execution of the contract. And it is to be presumed that in their minds was the possibility that the engineer might err in his determination of such matters. Consequently, to the end that the interests of neither party should be put in peril by disputes as to any of the matters covered by their agreement, or in reference to the quantity of the work to be done under it, or the compensation which the plaintiff might be entitled to demand, it was expressly stipulated that the engineer's determination should be final and conclusive. Neither party reserved the right to revise that determination for mere errors or mistakes upon his part. They chose to risk his estimates, and to rely upon their right, which the law presumes they did not intend to waive, to demand that the engineer should, at all times, and in respect of every matter submitted to his determination, exercise an honest judgment, and commit no such mistakes as, under all the circumstances, would imply bad faith."

And in Chicago, Santa Fe & California Ry. Co. v. Price, supra, that court, still speaking through Mr. Justice Harlan, further said:

"The mere incompetency or mere negligence of the division or chief engineer does not meet the requirements of the case, unless their mistakes were so gross as to imply bad faith."

While in Vanderwerker v. Vermont Cent. Ry. Co., supra, the Supreme Court of Vermont announced this doctrine in this language:

"The contract contains the usual clause that 'the engineer shall be the sole judge of the quantity and quality of the work, herein specified, and from his decision there shall be no appeal,' and in Herrick's Case it was considered upon great deliberation, that the engineer thus became the sole umpire, and that unless the company failed to furnish suitable engineers to make the estimates, no recovery could be had for work under such a contract, until estimated by the engineer, and after an estimate by the engineer, no recovery could be had beyond that sum, unless upon the most

irrefragable proof of mistake in fact, or positive fraud in the opposite party in procuring an under estimate, or corruption in the engineer, and in such case the appropriate tribunal for redress was a court of equity."

A review of the authorities cited will suffice to demonstrate that the proof of a party who attacks the award of an agreed umpire in a case of this character must be clear, convincing, overwhelming, and irrefragable. It must come within close proximity to what is called beyond a reasonable doubt. Such proof must meet these standards in order to have substance, and it must have substance in order to be regarded as substantial within the substantial evidence rule so oft repeated by this court.

From our painstaking review of the record, we think it contains no substantial evidence to support the material findings of the lower court, namely, that the final estimate was not founded upon actual and correct classifications made in good faith by a competent engineer in the exercise of an honest judgment, or that such engineer had made such gross mistakes and errors as to amount to fraud. That we have the authority to review the evidence to determine its sufficiency or insufficiency in this kind of a case, see Bavaria Inv. Co. v. Washington Brick, Lime & Sewer Pipe Co., 82 Wash. 187, 144 P. 681; Rogers v. Burt, 157 Ala. 91, 47 So. 226. Such findings cannot, therefore, be upheld on appeal. Epstein v. Waas, 28 N. M. 608, 216 P. 506. A further or more detailed discussion of the lengthy record before us will avail nothing.

For the reasons stated, the decree of the lower court must be reversed, and the cause remanded, with directions to enter a decree for the plaintiff for the amount due according to the final estimate of the engineer in charge, and

It is so ordered.

PARKER, C. J., and BOTTS, J., concur.

### ON REHEARING

S. J. Sackett, of Raton, and J. O. Seth, of Santa Fe, for appellant.

Crampton, Phillips & Darden, of Raton, for appellees.

WATSON, J. The original opinion takes the ground that, since the plaintiffs had the burden of establishing their case by extraordinary quantum of proof, a review by this court, to determine whether the findings of the trial court are supported by substantial evidence, involves the question whether the proofs reach the required standard. This is here the first point of attack. It is urged that such manner of review involves the weighing of evidence, which is no part of the function of this court; that the findings and judgment of the trial court have the same force and effect in this court as a verdict; and, finally, that in a nonjury case the rule of law as to the quantum of evidence operates only in the trial court, and that this court is, by statute and course of decision, precluded from noticing it, and without power to enforce it.

It is next urged that, since the record shows a view by the trial judge, we cannot review his findings; and, finally, it is urged that, regardless of the view, there is substantial evidence in the record supporting the findings.

It thus appears that our former decision is now questioned on the ground that we failed to give proper consideration and weight to the findings. In the original opinion the material findings were thus stated:

"That the final estimate was not founded upon actual and correct classifications, made in good faith by a competent engineer in the exercise of an honest judgment, or that such engineer had made such gross mistakes and errors as to amount to fraud."

In view of the contentions now made, we insert here such of the findings as are deemed material. Nos. XIV, XV, and XVI, and conclusion of law No. 1, are as follows:

"XIV. That plaintiffs in the excavation and construction of said flood intake canal excavated and moved 53,575 yards of materials in class 1; 5,395 yards of materials in class 2; 3,293 yards of materials in class 3, and 8,290 yards of materials in class 4.

"XV. That on or about the 6th day of May, A. D. 1919, said engineer made a pretended final estimate of the work done by said plaintiffs under said contract in the construction and excavation of said flood intake canal. That a true copy of said pretended final estimate is marked Exhibit B for identification, attached to and by express reference made a part of the complaint herein. That said pretended final estimate was not based upon actual and

correct classification, made in good faith by a competent engineer and competent assistants, in the exercise of an honest judgment. That said engineer made gross mistakes and errors in the classification and computation of the amount of yardage in the various materials excavated in the work done by plaintiffs under said contract in the construction of said flood intake canal, so that his said pretended final estimate shows 61,328 yards 'of material in class 1, whereas in truth and in fact there were actually 53,575 yards of material excavated by plaintiffs under said contract in the construction of said flood intake canal, which properly and actually fell in class 1; and 2,127 yards of material in class 2, whereas in truth and in fact there was actually 5,395 yards of material excavated by plaintiffs under said contract in the construction of said flood intake canal, which properly and actually fell in class 2; and 1,948 yards of material in class 3, whereas in truth and in fact there was actually 3,293 yards of material excavated by plaintiffs under said contract in the construction of said flood intake canal which properly and actually fell in class 3; and 5,539 yards of material in class 4, whereas in truth and in fact there was actually 8,290 yards of material excavated by plaintiffs under said contract in the construction of said flood intake canal, which properly and actually fell in class 4.

"XVI. That in said pretended final estimate on said flood intake canal the said engineer, in computing the amount of yardage in the various classifications, based the same upon a side wall slope of two to one, instead of the side wall slope as actually constructed, which was a dimension to meet the use in an effective manner of a standard type B Erie steam shovel for excavation and wasting of material; that in the construction of said ditch more of class 4 material lay in the bottom portion of said ditch; that said computation made on the basis of a two to one slope as aforesaid tended to decrease the amount of class 4, and increase the amount of class 1, and was contrary to the express provisions of said contract."

"Conclusion No. 1. That the plaintiffs are entitled to have said pretended final estimate hereinbefore mentioned and referred to in finding of fact No. XV canceled and set aside on the ground of gross mistake."

It has not been questioned that, if that part of finding XV in its substance quoted in the original opinion is unqualified and is true, the award should be vacated. But, considering the above-quoted findings as a whole, it is apparent that the trial court concluded as he did because, and only because, of the wide variance between a true classification of the excavated materials and that shown by the final estimate. The general conclusion rests upon the ultimate facts in finding XIV.

In considering finding XIV, we discover a peculiar situation, pointed out by appellant. Three witnesses, Messrs.

Briggs, Roach, and Blauvelt, testified as experts on the part of appellees. They examined the canal and the spoil banks, and gave their estimates of the quantities of materials properly belonging in each of the contract classifications. The following table represents the estimates of these experts, and includes the final or official estimate and the totals and averages of the four. For comparison, it includes the court's classification, shown by findings XIV and XV.

| | Class 1 Cu. Yds. | Class 2 Cu. Yds. | Class 3 Cu. Yds. | Class 4 Cu. Yds. |
|---|---|---|---|---|
| Briggs | 51,473 | 6,534.8 | 3,478 | 8,735 |
| Roach | 49,083 | 7,370.9 | 4,606.3 | 9,160.8 |
| Blauvelt | 52,419 | 5,552 | 3,142 | 9,829 |
| Final Estimate | 61,328 | 2,127 | 1,948 | 5,539 |
| Total | 214,303 | 21,584.7 | 13,174.3 | 33,263.8 |
| Average | 53,575 | 5,396 | 3,293 | 8,315 |
| The court | 53,575 | 5,395 | 3,293 | 8,290 |

The correspondence between the average and the findings is so remarkable that we consider it a demonstrated fact that the court solved the difficulties of the accounting he undertook by adopting the average of the quantities as shown by the final estimates and by appellees' three experts.

Appellees urge that the inclusion of the award in the computation profited appellant by lessening the judgment. But that is not the point. It discloses an error of law. The cause of action is equitable, to vacate the award. The question of damages or compensation arises only after vacation, and in order to complete the relief. The idea is not to substitute the judgment of the court for that of the umpire, nor to review the award. The final estimate must either stand or fall. If it falls, the court must settle the dispute as to compensation. Here it is apparent that the official estimate was deemed worthy of the same credit as unofficial estimates, but no more. The cause was determined as though no award had been contracted for. If good enough to be used as evidence, it was too good to be vacated. The manner of arriving at the finding impeaches the conclusion, as disregarding the contract of

the parties, the presumption with which the law surrounds the award, and the theory of the case. The error impeaches the judgment as plainly as if, in a criminal case, the jury had been instructed that it might convict upon a preponderance of evidence.

 How does this affect appellees' present contentions? We may concede, though not deciding, that findings of fact made by the trial court in recognition of the correct rule as to the quantum of evidence would be reviewable only to determine whether they were supported by substantial evidence. But we cannot, of course, be bound by findings erroneously arrived at. A finding made on preponderance of evidence, when the rule requires clear and convincing evidence, is no finding at all. So this court committed no error in disregarding the finding. The question being whether the conclusion of gross mistake, unsupported by found facts, was supported by proven facts, this court of course observed the rule as to quantum of evidence.

In the present situation, the view of the ground by the trial court is of no importance. What effect it may have had we cannot know. It is not reflected in the findings. The award is not condemned because of anything disclosed by it. If, as we hold, we were right in measuring the proofs by the rule announced in the original opinion, appellees' contention that the judgment is supported by substantial evidence might be ignored. Yet, because of the importance of the case, and of the elaborate manner in which counsel have spread the facts before us, we have felt impelled again to review this voluminous record, to assure ourselves that we have overlooked no proofs justly leading to a vacation of the award.

██ Construction was completed in March, 1919. The final estimate was made in May following. The preliminary work for the final estimate was done by Mr. Fenner, the resident engineer. His work was checked by Mr. Bartlett, the consulting engineer, on the ground, and some corrections and changes made. Appellees, being dissatisfied, employed Mr. Briggs to make estimates for them. His measurements and classifications were made in No-

vember, 1919. Mr. Roach made estimates a little later, and Mr. Blauvelt just before the trial in May, 1920. In January, 1920, Mr. Bartlett again went over the ground and rechecked his final estimate; this time having with him engineers Jones and McGregor as consulting assistants.

The canal was laid out in stations of 100 feet each, numbered consecutively from the upper end, with such plus stations as were deemed necessary on account of curves and variations in the character of the ground. For the most part, it was laid out with a two to one side wall slope; perhaps 2,000 feet with a one to one side wall slope. The excavating did not, however, exactly follow these lines; it being claimed by appellees that such slopes were impracticable of construction by the type of shovel specified in the contract. To what extent the actual excavation varied from the theoretical the record does not show. The work was accepted by appellant as satisfactory, and as being substantially down to grade.

The methods of estimating by the two sets of engineers were not the same. For the final or official estimates, the bottom grade level was carried from station to station, so that the measurements of the various materials in the excavation could be, and were, in effect, taken from the bottom grade up. It was found that the computations were based upon the theoretical rather than the actual slope. Mr. Briggs, for appellees, obtained from appellant a copy of the notes which were used in making the official estimate, and, wherever there was no classified material, adopted it as correct as to total yardage. Wherever he found classified materials, he claims to have taken actual measurements across the top and bottom of the ditch, between what he determined to be average side lines, across the top of the rock, in the malpais section, and the depth of rock; thus establishing, in effect, an average cross-section of the station as actually excavated. Instead of carrying the grade level from station to station, appellees' engineers relied upon their ability to determine at each station the original surface, thus in effect measuring from the top down. Mr. Briggs' figures for total yardage at the several stations were furnished to Messrs. Roach and Blauvelt, who used his total yardage estimates through-

out. The former computed the yardage of classified materials by the percentage system, and the latter, as he said, by his "eye and judgment," both occasionally taking measurements as a test of their work.

The official computations, according to the theoretical slope, are severely criticized as inaccurate and unwarranted. It was found by the trial court that, as the class 4 material was in the lower part of the ditch, while class 1 material was on top, this system "tended" to increase the estimate of the former and decrease that of the latter. On the other hand, there was expert testimony on the part of appellant that that method of computation was usual and substantially correct. However that may be, the evidence fails to show to what extent it affected the results. On the other hand, the method employed by appellees' experts is criticized by the engineers testifying for appellant. They claim that practically all of the cut stakes had been moved back by the contractor as the work progressed; that the soil banks came clear down to the edge of the excavation, especially through the malpais section, leaving no berm; and that it was impossible, with any degree of accuracy, to ascertain the original surface. They claim that the ditch as a whole averaged something below grade, and that at places in the malpais section it was a foot or more below grade; and that more than 1,400 yards of malpais were taken out below grade. Thus, if they determined the surface too low, two results would follow: The total yardage would be too small, and the percentage of rock would be too high. While appellees' experts claimed that they were able to locate the surface with substantial accuracy, they admitted that, if assumed that they did locate it too low, the results claimed would follow.

Beginning at the upper end of the canal, no classified material was found until coming to station 8-9, where Mr. Roach found 29 yards of class 2. At stations 9-11, Mr. Roach found 228 yards of class 2 and 204 yards of class 4. Mr. Blauvelt found 70 yards of class 4. The official estimate was 66 yards of class 4.

Stations 11 to 21 are the most important sections for consideration. There was found the heaviest percentage

of malpais. As the contract price for excavating this
material was $3 per yard, the importance of correct classi-
fication in this section was manifest. Speaking generally,
there were two classes of testimony—that of those who
participated in and actually observed the work of exca-
vation, and who described the character of the materials
and the methods of removing them, and that of experts,
who estimated and classified. Except for Mr. Roach, all
seem to agree that there were no materials, except dirt
and malpais. Appellees' witnesses of the former class
testified that there was but little dirt on top of the rock,
and that the dirt interspersed in crevices and pockets in
the rock was necessarily removed in the same manner as
the rock itself. Their experts testified that, if these con-
ditions prevailed, the whole of this section should have
been placed in class 4. The evidence was not undisputed,
however, and the experts themselves, judging from their
classifications, did not find those conditions to have existed.

The following table shows the estimate in this section:

| | Total Yds. | Compensation | Class 1 | | Class 2 | | Class 4 | |
|---|---|---|---|---|---|---|---|---|
| | | | Yds. | % | Yds. | % | Yds. | % |
| Official | 6,892 | $11,758 | 3,185 | 42 | | | 3,707 | 58 |
| Blauvelt | | $12,632 | 2,395 | 37 | | | 4,051 | 63 |
| Roach | | $14,241 | 1,165 | 18 | 762 | 12 | 4,517 | 70 |
| Briggs | 6,448 | | | | | | | |

The percentages are based on Mr. Briggs' estimate of
the total yardage. His other estimates for this section
were not put in evidence. Mr. Blauvelt, as it thus ap-
pears, is more nearly in agreement with the official figures
than with those of Mr. Roach. Here is an instance of
appellees' engineers estimating higher on class 4 material
and lower on total yardage. If the variance of 444 yards
occurred because Mr. Briggs measured below grade, and
all material below grade was class 4, the difference be-
tween the official estimate and that of Mr. Blauvelt would
be more than eliminated. From station to station there
is a variance between Roach and Blauvelt in the matter
of classification, which seriously reflects upon their accur-
acy and illustrates how widely experts may differ in

judgment in such matters. For instance, at station 11-12, of a total yardage of 541, Roach places 273 in class 4, and Blauvelt 112; at station 15-16, of a total yardage of 882, Roach places 217 in class 4 and Blauvelt 87; at station 17-18, of a total yardage of 855, Roach places 641 in class 4, and Blauvelt 342. At three stations the official estimates for class 4 are the highest.

Another malpais section occurs between stations 28 and 36. Here Bartlett's official estimate of the total yardage is 4,094; that of appellees' engineer 3,980. Bartlett places 3,389 yards in class 1 and 705 in class 4; Roach 1,402 in class 1; 658 in class 2, and 1,920 in class 4; Blauvelt 1,923 in class 1, and 2,057 in class 4. In this section there is no doubt that there was considerable class 1 material. While the total figures of Roach and Blauvelt agree fairly as to class 4, their discrepancies from station to station are still marked. Briggs' figures are given for only five stations, for which they total 100 yards less than Roach and over 400 yards less than Blauvelt.

The remainder of the malpais is found in stations 39 to 54. Here the total yardage, according to the official estimate, is 9,639, and, according to appellees' engineers, 8,850, a difference of 789 yards. If this difference consisted entirely of class 4 material, it would be very important. Here the official estimate places 8,868 yards in class 1 and 971 yards in class 4; Roach places 5,498 yards in class 1, 1,159 yards in class 2, and 2,197 yards in class 4; Blauvelt places 5,808 in class 1, and 3,002 in class 4. For the seven stations for which Briggs' estimates were introduced, he shows more than 600 yards less class 4 material than either Blauvelt or Roach. Throughout these malpais sections, Blauvelt, and apparently Briggs, agreed with the official estimate in placing the materials all in classes 1 and 4, while Roach places substantial yardage in class 2.

The next section extends from station 65 to station 82, including equation stations 54-56. Appellees call it the "loose rock" section, and it is also referred to as the "narrows." It was composed of dirt on top; the material below it being variously described. It was all removed

with a steam shovel. No plow tests were made. The final estimate showed a total yardage of 8,660, and Briggs' estimate showed 8,784. For this section Briggs' and Roach's estimates were introduced station by station—Blauvelt's total only. The final estimate placed all of this section in Class 1, except 241 yards in class 2. Briggs placed 5,005 yards in class 1; 3,509 in class 2 and 269 in class 4; Roach, 6,163 in class 1, 2,621 in class 2, and Blauvelt, 5,548 in class 1, and 3,236 in class 2. The compensation for this section, according to the final estimate would be $1,828.40; according to Briggs, $3,913.40; according to Roach, $2,805.20, and, according to Blauvelt, $3,051.20. All agreed in placing these materials in classes 1 and 2, except Briggs, who found 269 yards of class 4. It may be observed that the difference between Roach and Briggs is somewhat greater than the difference between Roach and the final estimates. The correctness of the award for this section depends upon whether the material in the lower part of the ditch could have been plowed. Upon this question—a matter of opinion—the evidence is in hopeless conflict.

Between stations 98-116, there was considerable dirt on top, concededly belonging in class 1. Beneath it was a white material which appellees' witnesses generally designated as lime rock, and appellant's witnesses as caleche. It was removed with a steam shovel, and probably without shooting. The official estimate for this section was 4,545 yards of class 1 and 1,833 yards of class 2—$2,009.00; Roach 4,210 yards of class 1, 1,101 yards of class 2, 1,153 yards of class 3—$2,944.00; Blauvelt, 4, 199 yards of class 1, 2,122 yards of class 2, and 143 yards of class 3 —$2,292.00. It will be observed that here Blauvelt agrees much more closely with the official estimate than he does with Roach. On the most important question as to whether the lower material was really rock, belonging in class 3, Blauvelt's testimony does not support appellees' theory. In this section Briggs' estimates were not used.

For the lower section of the ditch, stations 126-152, the official estimate was 1,949 yards class 1, and 1,948 yards class 3—$2,825.00. Roach estimated it, 438 yards class 1; 407 yards class 2, and 3,270 yards class 3—$4,419.00.

Blauvelt estimated it, 1059 yards class 1; 109 yards class 2, and 2,999 yards class 3—$4,026.00. The important controversy here concerned a considerable portion of this section which had been stripped of its overlying dirt under an earlier contract. The character of the exposed material was in dispute. Appellees call it stratified lime rock, and claim that their engineers properly classified it as 3. While this material could doubtless not be plowed to advantage, it is questionable whether shooting was necessary to its removal by the steam shovel. The greater part of it was blasted, but when powder was not at hand, this work seems to have progressed without shooting. Mr. Bartlett, deeming the material quite uniform, and knowing that a great deal of it had been removed by shooting, thought it unfair to place it in class 2, but believed that the material did not meet the test for class 3. He, therefore, placed it, 40 per cent in class 1 and 60 per cent cent in class 3. This classification Mr. Jones considered fair. Mr. Bartlett says:

"At the time it was excavated, it was what we call caleche. There were little hard layers and a considerable amount of solid chunck matter between them: it was of an irregular conglomerate character."

Mr. Fenner says that it was mostly caleche, with some lime rock. Mr. McGregor inclined to put the material in class 2 with a percentage of it in class 3. Mr. Jones said:

"The condition of that material is this. Some of it is hard limestone and some soft material, undoubtedly in its original location, but it is also not as hard to excavate as is that solid limestone or sandstone. The fact of it is these smaller and thinner layers of soft material tend to make it easier to excavate than a solid mass would be, and, in cases of that kind, it seems to me that this material would come under the part of the specifications regarding materials not clearly classified in the classes involved, and should be given a classification somewhere between classes 2 and 3."

Mr. Roach admitted that some of this material was softer than other, and says it is his recollection that the softer material was found on top of the harder lower stratum. Thus we find a sharp conflict as to the real character of this material. It was apparently the most delicate to classify of all those found. It was a matter requiring

engineering judgment. The judgment of Blauvelt and Roach differed substantially from that of Bartlett and Jones. We have no means of determining which were right, and no reason to doubt the honesty of any of them.

We have thus taken a brief survey of the entire canal. Our search has been for some mistake in the final estimates, clearly and convincingly disclosed, so great as to amount to fraud upon appellees. We have found none. We find wide variance in the judgment of experts, but this is the constant experience in cases of this kind. It is in anticipation of this that parties usually agree, in advance, to be bound by the judgment of the umpire of their selection. If it be assumed that their engineers are right, appellees are greatly injured by the final estimates; but, if the latter are correct, the judgment of the trial court does appellant great injury. Mr. Fenner and Mr. Bartlett were admittedly better situated than the others to make correct classifications and estimates. Their work is approved generally by Mr. McGregor and Mr. Jones. Appellees say that they place the greatest reliance upon Mr. Roach and Mr. Blauvelt, and point to an almost identical result reached by them in the computation of the total compensation for the work. In view of the great divergence of their estimates from station to station, we are compelled to view this final agreement as more or less accidental. Not doubting the high standing and ability of these engineers, we are not impressed with their accuracy. Mr. Blauvelt spent but six or seven hours on the canal, during which he made classifications at 96 stations. Mr. Briggs made complete estimates, apparently in a more systematic and thorough manner, but was asked to testify to them only as to selected stations. These gentlemen say that the materials in this excavation are not difficult of classification, and that it can be done with a reasonable degree of accuracy; yet, if either were assumed as the standard, the others would be shown to have erred substantially in a great many instances.

In work of this kind the materials cannot be measured and classified yard by yard as removed. Even if they were, experts would no doubt differ at times as to classification. Absolute correctness is merely ideal. The expert cannot hope to attain it, much less the court. Errors

are presupposed. That other engineers should find errors in the work of the umpire was to be expected. That their own work is not free from error is not only to be expected, but is demonstrated. The question is not, which of the experts was, in the court's opinion, most nearly correct. It is whether the parties have received what they contracted for, the honest judgment of the expert of their choice. If they have not, no course is left for the court but to reach a judgment of its own, however poorly it may be equipped for the task. But, before the umpire's decision can be set aside, and the court's judgment substituted for it, it must appear to have been actually fraudulent, or so grossly mistaken as to amount to fraud. We find no evidence of actual fraud. However we may doubt the correctness of the final estimates in general, we can point to but one particular in which they are clearly wrong.

At the January recheck it developed that at three places in the malpais section Mr. Fenner had placed the top of the rock somewhat too low; the result being the exclusion from the estimate of 380 yards of class 4 material. This Mr. Bartlett himself admitted. It thus clearly and convincingly appears that here is a mistake in the final estimates. This was overlooked in the former review. The mistake appears as a mere inadvertence. There is nothing in its nature, or in the facts surrounding the making of it, to taint the estimates as a whole. It is easily separable from the rest and easily corrected. Its correction does not involve the substitution of the judgment of the court for that of the umpire. Except for a mistake in measurement discovered and admitted by the umpire himself, his estimates would have included 380 yards less of class 1 and 380 yards more of class 4. We think that this is clearly such a mistake as, under modern authorities, the court may and should correct. 2 R. C. L. 397; 5 C. J. 197.

We hold, therefore, that the judgment is erroneous and must be reversed; that our former disposition of the cause was correct, except as to the mistake just pointed out; that the final estimates should be corrected and reformed, by deducting from the total of class 1 material 380 yards, leaving 60,948 yards as the total of such material, and by

adding to the total of class 4 material 380 yards, making 5,919 yards the total of such material; and that the cause should be remanded, with directions to enter a decree for appellees for the amount due according to the final estimates of the engineer in charge, as thus corrected and reformed, less the amount of appellant's counterclaim as stipulated in the court below; and it is so ordered.

PARKER, CATRON, and SIMMS, JJ., concur.

BICKLEY, C. J., being disqualified, did not participate.