573 P.2d 1194

**Darthy Lindberg HUGHES,
Plaintiff-Appellant,**

v.

**James Lindberg HUGHES et al.,
Defendants-Appellees.**

No. 10480.

Supreme Court of New Mexico.

Jan. 13, 1978.

Arthur H. Coleman, Albuquerque, for plaintiff-appellant.

Rodey, Dickason, Sloan, Akin & Robb, Joseph J. Mullins, Albuquerque, for defendants-appellees.

## OPINION

EASLEY, Justice.

This suit for divorce and division of property was filed by plaintiff-appellant, Darthy Lindberg Hughes (Mrs. Hughes) against defendant-appellee-cross-appellant, James Lindberg Hughes (Col. Hughes). Mrs. Hughes appealed, claiming errors in the division of property by the trial judge.

We affirm in part and reverse in part.

The principal issue is particularly troublesome and is one of first impression in New Mexico.. The resolution of the question may very materially affect the property rights of tens of thousands of New Mexico married people who were domiciled in and acquired money and property in non-community property jurisdictions, then sold the property, moved to New Mexico and invested their money in property in this state.[1]

The following are the essential facts necessary to frame the issue. The parties were first legally domiciled in Iowa, a "common-law" state where a wife has no vested interest in the wages of the husband or in property purchased with those wages. Money, accumulated solely from the wages of Col. Hughes while the parties were domiciled in Iowa, was later used to supply all the down payment on certain ranch property and more than one-half the down payment on some apartments. The parties became legal domiciliaries of New Mexico. The property doubled in value. This action was brought to obtain a divorce and divide the property.

The question: on divorce of a New Mexico couple, what are the wife's rights to share in the husband's separate property invested in this state but which was accumulated from his earnings during their marriage while domiciled in a non-community property state?

### The Dispositive Facts

The record in this case is extremely fragmented, garbled and complicated, through no fault of. the parties. Numerous facts and issues raised by both parties will not be repeated here, although they were very carefully considered by the Court.

The parties were married in Washington, D.C. on January 22, 1955, while Col. Hughes was in military service. At all material times prior to July 10, 1966, the date the parties established New Mexico as their domicile, Col. Hughes retained his home state of Iowa as his legal residence.

The parties decided to establish a new and permanent domicile and invest in property for a future home. Mrs. Hughes took the initiative to write to various states to obtain information. They decided on Santa Fe, New Mexico as the city in which they desired to establish a home. They purchased an unimproved tract of land in Santa Fe County in 1965 and moved to Santa

1. 1970 Census figures show that 40% of the total population of New Mexico came from another state. U.S. Dept. of Commerce 1970

Census of the Population, Characteristics of the Population, Part 33, New Mexico, Table 45, at 100.

Fe in July 1966. They subsequently purchased the apartments which are a subject of this appeal.

In 1967, after moving to New Mexico, Col. Hughes was ordered to combat duty in Viet Nam and on May 5 of that year near Hanoi, North Viet Nam, his airplane was shot down. He was captured and held as a prisoner of war until March 3, 1973. During this six-year period Mrs. Hughes and the children maintained their residence in Santa Fe and Mrs. Hughes worked to maintain and develop the properties in question here, as well as another group of apartments purchased by the parties, located at 120 W. Santa Fe Avenue (hereinafter: 120 apartments), which latter apartments were found by the trial court to be the community property of the parties.

We will discuss material facts later that relate to the other claims of the parties together with our analysis of the law as to each of those points.

### Purchase of the Ranch

Before moving to New Mexico, Mrs. Hughes advertised in the Santa Fe New Mexican to try to find some desirable real estate. As a result of this effort the parties heard from a prospective seller, came to Santa Fe and, on February 16, 1965, Col. Hughes signed a contract to purchase one hundred sixty acres of open land near Cañada de Los Alamos in Santa Fe County (the ranch). The purchase price was $35,600.00, with $8100.00 as the down payment and the balance payable in ten equal annual installments. The undisputed evidence is that the ranch is now worth $144,000.00.

Mrs. Hughes was not independently employed during the marriage of the parties. She and Col. Hughes initially brought only an insignificant amount of separate property into the relationship. For our purposes here, it can be considered that the original source of money and assets used in the purchase of the ranch was the military pay of Col. Hughes. The court found that the entire down payment on the ranch was made from money accumulated by Col. Hughes "while a resident of a common-law

state." One annual installment was paid from the same source of funds, but a number of the succeeding installments were paid from what the court held to be community funds.

Mrs. Hughes claims that her work and efforts added a great deal of value to the property. She and the children planted 1200 trees on the land. She made payments on the property from their community funds for the six years during which Col. Hughes was absent, obtained a right-of-way for access to the property and had an A–frame shelter constructed on the premises.

### Purchase of the 115 Apartments

In May of 1966 the parties negotiated to purchase apartments located at 115 W. Santa Fe Avenue in Santa Fe (hereinafter: 115 apartments). A proposed written contract was presented and $3500.00 was paid into escrow by Col. Hughes, but the contract was not finally executed until July 15, 1966, after the family had moved to Santa Fe on July 10th. The contract was signed by both Col. and Mrs. Hughes and called for a joint tenancy deed. The purchase price was $93,500.00 with $13,500.00 being paid down and the balance being payable in annual installments. This property increased in value to $186,000.00 by the time of trial.

The $3500.00 deposited in escrow and applied against the down payment was traced to the military pay Col. Hughes earned before he became a legal resident of New Mexico. $2467.65 was obtained from a joint checking account of the parties in the National Bank of Ft. Sam Houston, Texas, where the couple had just previously obtained a loan in the amount of $3,000.00. Loans were obtained from Col. Hughes' mother in the amount of $1500.00 and from Mrs. Hughes' parents in the amounts of $5,000.00. These amounts were all traced as having been part of the down payment. All the loans were obtained before the family established residence in New Mexico. There was a difference of $1,032.35 between the above amounts and the total down payment of $13,500.00 which $1,032.35 was not

specifically traced, although Col. Hughes testified that it was initially accumulated from his military pay.

Funds from the rental of the 115 apartments were commingled with the salary of Col. Hughes, rental income from the 120 apartments and money obtained by Mrs. Hughes from bank loans. Annual payments on the purchase contract of the 115 apartments and the ranch were made from these commingled funds during the years that Col. Hughes was a prisoner of war.

Mrs. Hughes took care of the 115 apartments during the period that Col. Hughes was absent from the state. She collected the rentals, did repair work herself and supervised other work on the units, kept the books, borrowed money and did all of the usual and ordinary tasks that an owner and manager would do to operate and maintain the apartments.

### Claims of the Parties

Mrs. Hughes claims that at all times Col. Hughes represented to her and others that the ranch and apartments were to be jointly owned by them and that income therefrom would furnish the family additional support after Col. Hughes' retirement from the military service. She maintains that both the ranch and the 115 apartments are community property, or in the alternative, are the joint property of the parties and should be equally divided. She asserts that Col. Hughes is estopped to deny her one-half interest, or in the alternative, that he contracted with her for the ownership of a one-half interest.

She complains that Col. Hughes is relying on the Iowa law to establish his claim that all of the assets brought into New Mexico were his separate property, but that under the Iowa law, when a divorce is granted in that state, the courts equitably divide the husband's property with the wife, taking into consideration the wife's contribution to the accumulation of the assets of the marriage.

Col. Hughes maintains that the ranch and the 115 apartments are his separate property by reason of having been purchased with separate property brought into this state from another jurisdiction. He contends that he never intended to vest a one-half interest in his property in New Mexico in his wife and that he took no actions and said nothing upon which she could base claims of estoppel or contract.

### Decision of the Trial Court

The trial court decided that since all the money paid down on the ranch and more than half of that paid down on the 115 apartments was accumulated or borrowed while Col. Hughes was a resident of a common-law state, those properties were his sole and separate estate and that Mrs. Hughes would be allowed only the value of her one-half community property contribution to the subsequent annual payments. Under the trial court's decision the practical effect is that the appreciation in value of approximately $200,000.00 in the ranch and 115 apartments would be the property of Col. Hughes in which Mrs. Hughes would have no share.

### Conflicts in Marital-Property Law

Migration of millions of people from the common-law marital-property states into the eight states, including New Mexico,[2] that follow the civil law, or community property, system of marital property, has focused a great deal of attention on the conflicts between the two different legal systems. It seems inconceivable, to persons who have become accustomed to the concept of community ownership of all assets acquired during marriage, that a vast majority of the women in the United States do not have the advantage of those rights.

We disagree with the out-moded marital property systems of the non-community property states. We hold that the bare legal principle urged by Col. Hughes, that a wife has no interest in the wages, earnings, and profits of the husband or in the property accumulated by his efforts, can be char-

---

2. Arizona, California, Idaho, Louisiana, Nevada, Texas and Washington.

acterized as a relic of the dark ages that should have equal place with the ancient cliche that "a woman's place is in the home, barefoot and pregnant." As will hereafter appear, even the common-law states have engrafted some exceptions onto the principle of the husband's sole ownership.

It comes as no surprise in this era of awakening of American womanhood that legislatures and courts in the common-law states are straining mightily to upgrade the marital-property rights of women.[3]

The reasonableness of community ownership of marital property has been recognized by courts in non-community property states. It has been rightfully held that, viewed solely as a matter of economy, the labor, pain, and drudgery required of the mother in sustaining the home, giving birth to and rearing the children will often more than offset the contribution of the father to the family budget. In *Strauss v. Strauss*, 148 Fla. 23, 3 So.2d 727, 728 (1941) the court wistfully pointed out:

In the southwest, where community property is recognized, the husband and wife share equally in all property accumulated during coverture. There is a perfectly sound basis for this rule and it will be applied in this State when the circumstances warrant.

Laws on this subject are being scrutinized across the country and changes are in prospect.

If the question is otherwise open to doubt, one only need scan the efforts of legislatures in non-community states, through the Married Women's Property Acts, to raise the property rights of married women up from a level similar to that once occupied by slaves, to be convinced that of the two systems of marital-property in the United States, the one most suited to the realities of modern domestic life is the community property system.

Brown, *supra*, at 287–88.

■ Under community property law no distinction is made between husband and wife in respect to the right each has in the community property. The husband receives no higher or better title than does the wife. The plain public policy that this law expresses is that the wife shall have equal rights and equal dignity and shall be an equal benefactor in the matrimonial gain. "It is altogether fitting and proper that woman should be thus esteemed by the law in fixing her status if she is to be considered in fact as well as in theory an essential factor in the economy of the marital community." *La Tourette v. La Tourette*, 15 Ariz. 200, 137 P. 426, 428 (1914).

On the other hand, the non-community property states, including Iowa, where Col. Hughes was legally domiciled when he earned the money paid on the New Mexico property, hold to the principle that property accumulated by use of the husband's wages is his separate property. This conflicts with the community property concept of New Mexico. The first question that arises is whose law do we apply to determine the nature of the property in question?

■ This Court has followed what is overwhelmingly the general rule that funds or property, brought in from a non-community property state where the funds or property were there considered to be the separate property of an individual, will retain the same character when traceable into New Mexico property. *Koprian v. Mennecke*, 53 N.M. 176, 204 P.2d 440 (1949). Therefore, it is clear from our decisions that where Col. Hughes brought money, accumulated from original earnings, into New Mexico it remained his separate property when it crossed the state line and was later invested here. We therefore resolve the conflict of laws in favor of applying the Iowa law to determine the character of the property traced to Col. Hughes' earnings.

The question then arises as to what law we apply to determine whether Mrs. Hughes has a legal or equitable right to

---

**3.** Brown, *Conflict of Laws Between Community Property and Common Law States in Division of Marital-Property on Divorce*, 12 Mercer L.Rev. 287 (1961); de Funiak, *Conflict of Laws in the Community Property Field*, 7 Ariz.L.Rev. 50 (1965).

have any portion of Col. Hughes' separate property awarded to her in this divorce action. It is at this juncture that we step into the quagmire.

Textwriters and other legal scholars have attempted for years to reconcile the morass of theories relating to community property and the conflicts-of-law. One such authority has made an apropos statement:

The realm of the conflict of laws is a dismal swamp, filled with quaking quagmires, and inhabited by learned but eccentric professors who theorize about mysterious matters in a strange and incomprehensible jargon. The ordinary court, or lawyer, is quite lost when engulfed and entangled in it.

William L. Prosser, quoted in W. Brockelbank, *The Community Property Law of Idaho* 297 (1962) and Goodrich, *Directive or Dialectic*, 6 Vand.L.Rev. 442 (1953).

There is surprisingly little law on the subject, and none in New Mexico, but the problem is evident in divorce cases as well as in the distribution of decedent's estates. Col. Hughes urges that when his money, classified as "separate" under Iowa law, was invested in New Mexico property, it remained "separate" and that therefore his wife has no interest, and, ipso facto, the husband takes all. Only a few courts in community property states have considered the issue, but they have held that separate property as defined in common-law jurisdictions is not the same creature as separate property under community property law. It is a case of comparing apples and oranges. *See, e. g., Rau v. Rau*, 6 Ariz.App. 362, 432 P.2d 910 (1967).

There are two distinct interpretations. Although wives in common-law states have no *legal title* to property purchased with the husband's earnings, the case law in those states has created many benefits, incidents, and immunities in favor of wives that attach themselves to such separate marital property. Therefore the wife, in many common-law states and certainly in Iowa, has inchoate equitable rights to her husband's separate property where she has made contributions to preserving and bettering that property, whereas in a typical community property state she has no such rights since she has community property rights instead. There is an obvious difference between property which *first* acquires its separate nature while the husband is domiciled in a community property state, and his separate property that can be traced to property acquired in a common-law state where the wife has inchoate equitable rights in that property.

Although the facts are not precisely analogous to those in the instant case, *Rau v. Rau, supra,* provides some guidance in this situation. In *Rau* the husband owned a farm in Illinois prior to the marriage of the parties. He made a gift of the farm to his son, but had earnings amounting to $4300.00 from the farming operation. The wife had performed all normal duties of a housewife and in addition had actively participated in the farming operation. The parties moved to Arizona where a forty-acre farm was purchased with the farm earnings, title being taken in the name of the husband. The couple resided on the farm until the divorce action was begun.

The lower court in *Rau* found that the farm was community property, but the Arizona Court of Appeals held that this was in error. The court held that the farm and the money therefrom was separate property under Illinois law and retained its separate nature after having been removed to Arizona.

Although Arizona has a statute which says that upon divorce the court shall order a division of the property that is "just and right" without compelling either party to *divest title to separate property*, the court held that determination of what is just and right should not be frustrated because the statute prohibits divestiture of separate property. The court examined the statutory and case law of Illinois and satisfied itself that if the monies earned from the farm in Illinois had been invested in Illinois real estate and title taken in the husband's name, it would have been appropriate under the laws of that state for the divorce court to set aside to the wife a one-half interest

in the property either as property in which she had an equitable interest or as an award in lieu of alimony.

That court called attention to the fact that a construction is placed on the term "separate property" in Illinois different from that in Arizona and that applying the restrictions contained in the Arizona statutes in the determination of what would constitute separate property in Illinois would lead only to unjust and unreasonable results.

*Rau* was followed in *Burton v. Burton*, 23 Ariz.App. 159, 531 P.2d 204 (1975) in which the facts were almost identical. The wife had worked on the husband's farm in Illinois, keeping books, grooming cattle for cattle sales and helping to care for hogs. The husband realized $25,000.00 from the sale of the farm and the money was reinvested in Arizona for a residence held in the name of both parties. The court looked to Illinois case law and found that the Illinois courts had held that the wife has, from equitable considerations, other and additional interests in her husband's property because of her status as a wife. Illinois holds, for example, that:

> "if the real estate represents the joint earning, work or savings of the parties, the court may properly, when dissolving the marriage relation, decree that the wife shall be vested with the title in fee to such real estate or some other real estate belonging to the husband, in order to effect an equitable and fair adjustment of the property rights of the parties."

*Burton*, 531 P.2d at 208, *citing Anderson v. Anderson*, 380 Ill. 435, 44 N.E.2d 54, 57 (1942).

The Arizona court in *Burton* went even further to state that proceeds from the husband's insurance policies, even though they were the husband's separate property could be awarded in part to the wife since they were traceable to the down payment on the property in question. The court ruled that the equitable interest of the wife could not be limited to the specific property to which the wife contributed money or labor. "In order to affect [sic] an equitable and fair adjustment of property rights the wife can be given title to other property of the husband." *Id.*, 531 P.2d at 208.

A case from another community property jurisdiction, *Berle v. Berle*, 97 Idaho 452, 546 P.2d 407 (1976), is analogous to our case on the facts. In *Berle*, the parties had lived in the common-law state of New Jersey where they accumulated movable property which the husband took to Idaho. The Idaho trial court held that the securities and bank accounts in question were the separate property of the husband. The husband contended that, in determining the proper distribution of this property, the law of Idaho which prohibited the division of separate property upon divorce should be applied, rather than the law of New Jersey which recognized that the wife has a right to share in the distribution of separate property on divorce. The court was persuaded that the concept of the term "separate property" in New Jersey was different from the concept in Idaho and that such property under New Jersey law carried with it the qualification of incidents of ownership in the wife that the New Jersey common law jurisdiction attached to it. The court quoted New Jersey statutes and case law to support the ruling that the New Jersey interpretation was different from that in Idaho and the Idaho court saw no reason to defeat the wife's claim by applying an Idaho statute not designed to govern the property in issue. The Idaho court ruled that, upon remand, the husband should be awarded that to which he would be entitled under New Jersey law.

Professor Marsh in his concise treatise, *Marital Property in Conflicts of Law* (1952), provides a scholarly dissertation on the "choice-of-law problem." He states, at 68 et seq., that the first basic level of inquiry is about the *purpose to be achieved* by the litigation. He recognizes that rules and principles are merely tools by which some social purpose is accomplished. If these basic policy considerations are lost sight of, the application of the rules becomes mere mechanical jurisprudence. He points out

that there is a great divergence in the laws of common-law states as well as the community property states regarding the meaning of various terms, including property terms, and the "characterization" given them under the laws of the various states. He calls attention to the complicated interplay of the laws regarding marital property with the laws of succession, taxes, divorces, dower, homestead, immunities, and other matters.

Marsh's theory is that where the law of the forum calls for looking at the law of another state, it is logical and reasonable to look at all of the law of the latter state and all dispositive rules, claims and legal relations. He favors applying the law of the selected jurisdiction as a whole, not merely part of such foreign law, prematurely chosen.

It is to the credit of the California legislature that a more direct approach has been adopted to solve this conflicts problem. For a period of years extending from 1917 to 1961 the California legislature attempted to find a solution to the difference in marital-property laws. A legislative act created what is called "quasi-community property," which designates property acquired by a person domiciled outside California, which property would be separate property by the law of that domicile but which would have been community property if acquired while domiciled in California.[4] Upon divorce, quasi-community property is to be divided in the same way as community property.

In *Addison v. Addison*, 62 Cal.2d 558, 43 Cal.Rptr. 97, 399 P.2d 897 (1965) the supreme court held the above California statute constitutional.

■ We take into consideration the basic public policy of this state, the sociological impact of the rule we here establish and the purpose to be achieved by divorce and property settlement litigation. The state clearly has a vital interest in the community estate. It is obvious from our statutory framework concerning marital relationships, their creation, their dissolution and

the manner in which the parties to the marriage may hold property, that the state deems itself to be an interested party. *Wiggins v. Rush*, 83 N.M. 133, 489 P.2d 641 (1971).

It follows that New Mexico courts should make a choice of laws that would achieve a fair division of marital property considering all of the circumstances and laws involved.

■ Although our statutes permit the invasion of a spouse's separate property under certain circumstances, § 22–7–6 B(1), N.M.S.A.1953 (Supp.1975), our legislature has not taken what appears to be a very desirable step as was done by the California lawmakers. Thus, it devolves upon this Court to make a choice of laws between those applicable in the State of New Mexico and those applicable in the State of Iowa to determine the extent to which Col. Hughes' separate property may be awarded to Mrs. Hughes. Although the property traceable to Col. Hughes' earnings was clearly his separate property, we hold that the characterization of this property as separate must be made under the applicable laws of the State of Iowa and therefore the property is subject to all the wife's incidents of ownership, claims, rights and legal relations provided in any and all of the laws of the State of Iowa that affect marital property.

Unjust results would obtain by applying the narrow interpretation of the term "separate" as it applies to property originally acquiring its separate character in New Mexico to the property involved in this case. We hold that such a misapplication is against the public policy of this state. It is unconscionable that Mrs. Hughes would, as a practical matter, be deprived of all interest in approximately $200,000.00 in property value, which was accumulated by the joint efforts of both parties, by a blind acceptance of a definition that considers only one of many applicable laws or factors. We must look to the whole law of Iowa bearing on marital property to determine the parties' rights in this property.

4. Cal.Civ.Code §§ 4800 & 4803 (West) (Supp. 1977).

## Marital Property Under Iowa Law

Turning to the Iowa law, we find that state's supreme court frequently asserting that each case must be considered on its own fact situation. Although recognizing the legal principle that property accumulated from the husband's earnings is his separate property, the courts in divorce cases almost always award the wife a large part of the property acquired during coverture. In looking at a variety of these property division cases, we find that the amount of the husband's separate property that is given to the wife under circumstances fairly analogous to those in the instant case ranges from one-third to two-thirds of the property involved.

In *Schantz v. Schantz*, 163 N.W.2d 398 (1968) the Iowa Supreme Court set forth guidelines to be used in awarding alimony and making a distribution of property on divorce. These included: the duration of the marriage; number of children, their ages and needs; net worth of property acquired with contributions of each party by labor or otherwise and net worth and present income of each party; conduct of the spouse; physical and mental health of each party; earning capacity of each party; training, education and life expectancy of each party; any sacrifice by either spouse in furthering or preserving the marriage; standards of living and the ability of one party balanced against the relative needs of the other; any other relevant factors which aid in reaching a fair and equitable determination as to respective rights.

In *Schantz* the court awarded the wife approximately one-half of the property accumulated during coverture. In *Locke v. Locke*, Iowa, 246 N.W.2d 246 (1976) the wife was awarded approximately forty percent of the marital property. It appears that the court awarded the wife property valued at approximately one-half of the husband's salary for a ten-year period, where the parties had been married for sixteen and one-half years in the case of *In re Beeh*, Iowa, 214 N.W.2d 170 (1974). The court in the case of *In re Marriage of Romig*, Iowa, 207 N.W.2d 780 (1973) award-

ed the wife approximately one-half of the marital property. *In re Marriage of Cook*, Iowa, 205 N.W.2d 682 (1973) the wife was awarded approximately one-third; in *Madsen v. Madsen*, 261 Iowa 476, 154 N.W.2d 727 (1967) the wife received close to one-half of the value of the property valued at the time the wife left the husband ten years prior to the divorce; in *Cooper v. Cooper*, 259 Iowa 277, 144 N.W.2d 146 (1966) the wife got two-thirds of the property even though her contribution was only $17,000.00 out of a total of $45,000.00 in value and in *Gerk v. Gerk*, 259 Iowa 293, 144 N.W.2d 104 (1966) and *Pfab v. Pfab*, 257 Iowa 303, 132 N.W.2d 483 (1965) the wife received approximately one-half of the marital property.

The trial court in our case found that the money in question that was paid as down payments on the ranch and the 115 apartments was borrowed or accumulated while the parties were domiciled in a common-law state. Based solely on these findings, the court concluded as a matter of law that Mrs. Hughes was not entitled to any share in these properties, except to receive the value of her share of the community funds used to pay for the same. We hold that the court entertained an erroneous belief as to the applicable law, having no guidance from New Mexico case law. The court obviously felt that the wife had absolutely no legal or equitable claim to a portion of this property.

We reverse the trial court on this issue and remand for that court to consider Mrs. Hughes' right to a share of these properties in light of this decision and the applicable Iowa case law. This court has held that a trial court's findings of fact, where based on an erroneous legal theory, are not binding on the appellate court. *Odell et al. v. Colmor Irr. & Land Co.*, 34 N.M. 277, 289, 280 P. 398 (1924).

### Social Security Payment

██ Mrs. Hughes also claimed the trial court was in error in holding that social security payments were the separate prop-

erty of Col. Hughes. After Col. Hughes returned from Viet Nam the Social Security Administration paid him the sum of $18,-259.00, but the evidence is undisputed that $4,872.00 of this amount was indicated by that federal agency as being due to Mrs. Hughes. The testimony by an official of the Social Security Administration was that the amount was included in the Col. Hughes check for convenience only.

Col. Hughes contends that all of the social security money was his separate property because it was paid for physical disability or was a bonus or gift from the government as an award for the hardships endured by him while a prisoner of war. Mrs. Hughes alleges that all of the money was community property, or, in the alternative, at least the $4872.00 which the government recognized as being payable to her should be considered to be her separate property. The trial court found that the entire amount of the social security payment was the separate property of Col. Hughes.

We find no fault with the trial court's conclusion insofar as it would apply to $13,-387.00 that the federal agency determined was payable to Col. Hughes, but we find no support in the facts or the law for the trial court's conclusion that the $4872.00 determined to be owing to Mrs. Hughes was the separate property of Col. Hughes. The record in this case graphically discloses that Col. Hughes suffered hardships as a prisoner, but he was not alone in this regard. The hardships of the prisoner's wife are not to be ignored; and it is rather obvious that the United States government was not oblivious of this consideration. If the husband is to receive an award for enduring hardships as a prisoner of war, it seems only fitting that "what is sauce for the goose is sauce for the gander," and vice versa, with the wife being entitled here to rely on the same argument employed by the husband. We hold that the trial court was in error on the finding and the legal conclusion and that the $4872.00 is the separate property of Mrs. Hughes.

## Col. Hughes' Campaign Debts

■ Col. Hughes ran an unsuccessful race for the Republican nomination for Governor of New Mexico in 1973 and early 1974. There were debts owed on the campaign at the time the divorce was filed. Mrs. Hughes attempted to have the trial court declare these to be the separate debts of Col. Hughes. The court did not make a specific finding to that effect but listed the debts in the conclusions of law as being "debts incurred by the parties during their marriage." Also, there was no finding or conclusion to the effect that the debts were not community debts or that there was good reason for them to be classified as Col. Hughes' separate debts. The court concluded that the campaign debts would be paid by Col. Hughes alone. We find no substantial evidence in the record upon which to base a conclusion that Col. Hughes alone should be responsible for these debts. The calculations should reflect an equal division of these debts between the parties.

■ Col. Hughes in his cross-appeal also alleges that the division of the community property favors the wife to the extent that she was awarded $27,117.36 more than was received by Col. Hughes. The claim is a legitimate one. He claims that the trial court in its findings and conclusions gave Mrs. Hughes credit for the $48,000.00 debt owed on the 120 apartments twice, once by deducting it from the total value of the apartments, and once by listing it as a debt. Two further mistakes were discovered in the court's calculations, a $3400.00 payment that should have been assigned solely to the husband on the debt against the ranch, and a debt in the amount of $693.26 due Peat, Marwick & Mitchell for the preparation of the parties' 1973 income tax return, which should have been divided between the parties.

Col. Hughes reasons that the court either committed error as a matter of law by failing to list the 120 apartments at their appraised value of $160,000.00 or failing to divide all of the other debts equally. We agree, and hold that one-half of the $27,-117.36, or $13,558.68, in assets should be

transferred from Mrs. Hughes to Col. Hughes to offset this difference.

### Award of Alimony

█ The award of alimony by the trial court to Mrs. Hughes is premature and is hereby reversed for the reason that such a determination is not in order until the extent of property awarded to each party is determined. *Michelson v. Michelson*, 86 N.M. 107, 520 P.2d 263 (1974); *Otto v. Otto*, 80 N.M. 331, 455 P.2d 642 (1969).

### Award of Attorneys' Fees

Col. Hughes also raises the issue of the propriety of an award of attorneys' fees before the property of the parties has been settled. We agree and reverse the granting of attorneys' fees, so that the trial court on remand may take into consideration all of the circumstances in light of this opinion.

As regards Mrs. Hughes' claim of error in the division of Col. Hughes' pension, and the money received under the War Claims Act, we find that there was substantial evidence to support the trial court's conclusions and see no error of law involved.

No merit is found as to the other claims of the parties and these claims will be rejected.

We therefore affirm in part and reverse in part, as indicated herein, and remand the cause to the district court for actions not inconsistent with this opinion.

IT IS SO ORDERED.

McMANUS, C. J. and PAYNE, J., concur.