*Isaac Depas* vs. *Peyton R. Mayo & Wife.*

ISAAC DEPAS vs. PEYTON R. MAYO & WIFE.

1. A husband and wife residing in Louisiana, and having during the marriage acquired a large amount of property, temporarily remove to Missouri. While in Missouri, a part of the money belonging to the *community*, is by the husband invested in real estate, and the title taken in his own name. They subsequently return to Louisiana, and there the wife is divorced. The land in this State will be considered in equity, as held by the husband, in trust for the wife, to the extent of her interest in the money invested in its purchase, there being no evidence of any assent on the part of the wife to a change in the property by the investment.

2. The law of the place, in which the land is situate, governs the transfer of the land.

## APPEAL from St. Louis Circuit Court.

HAMILTON, *for Appellant.*

1. It is conceded, that the *matrimonial* domicil of the parties was New Orleans, they having mutually intended and agreed to fix their residence there. But a change took place, and St. Louis afterwards became their *actual* domicil.

The rules which have been established in such cases, are as follows:

The *matrimonial* domicil, governs as to all acquisition previous to the removal. But where there is a change of domicil, the law of the *actual* domicil will prevail, as to all *future* acquisitions of movable property. And, as to realty, *the law of the place where it is situated.*

2. The bill alleges that proceedings were instituted in the Parish Court of New Orleans, for a settlement of this same matrimonial community, and that the court had full and complete jurisdiction over the subject matter, but assigns no reason why another and distinct attempt at a settlement should be sought, nor does it state, what was done with the matter of the community. The presumption is, that the matter is still pending before that Court, and the exhibit made part of the bill, sustains this presumption. See page 12 of transcript, where the matter of settlement of the community between the parties, is referred under the order of the court, to a Notary Public, where, for aught that appears, it still remains.

3. The bill fails to show that by the laws of Louisiana, property thus acquired, by a change of

personalty into realty, would not be held by the husband in his own right. The rights of the husband are not to be taken away by mere implication.

4. The bill fails to shew what the respective rights of the parties *are on a disolution of the marriage.* The presumption is, that the wife procured by the decree of the Parish Court, all that she was entitled to, under the laws of Louisiana. Clearly the court had jurisdiction over the subject, and[could h]ve rendered an effectual decree for the protection of the wife's interest in this property, if it had been regarded as any longer belonging to the community. The court will presume in favor of the legality of the decree.

5. It does not appear from the stating part of the bill, but that the defendant is the creditor partner of the concern, to an amount much larger than the whole sum paid for the lot purchased.

6. By the conversion, the personalty was changed into realty, and partook of the nature a *new acquisition*, within the second rule cited.

7. The decree of the court is erroneous. It does not order an account to be taken and stated of the partnership community, but simply directs the commissioner to ascertain the amount of the rents, and the increased value of the land, and then awards execution, under which the *whole* of the rents and profits may be collected.

## Bogy, *on the same side.*

1. Is the law of the matrimonial domicil to govern?

2. Or is the law of the local situation of the property?

3. Or is the law of the actual or new domicil of the parties?

4. Does the same law apply to movable property as to immovable property, when it is situated in different countries?

1st. If a tacit contract be admissible at all, it is to be construed in the same way as if the law of the country of the marriage, were inserted in it. Secs. 157, 158, 159, p. 141, and following, and sec. 190, Story's Conflict of Laws 2d ed.; Saul vs. his Creditors, 17 Martin's R., 599; Decouche vs. Savatier, 3 John's. Ch. R., 190.

2nd. The extent of this tacit agreement, depends upon the extent of the law. Laws affecting real estate, or real laws as they are called, have no extra territorial force. Story's Con. of Laws, sec. 21, p. 20, 21; Bluchard vs. Russell, 13 Mass. R., 4; Bank of Augusta vs. Earle, 13 Peter's R., 584, 591.

3d. The doctrine of the common law as applicable to immovable property, is the law of the place, *rei sitae* governs. Sec. 454, Con. of Laws, p. 382, 383.

4th. If the law of community is purely real, a change of domicil can have no effect on the rights of the parties. See the views of different points in Story's Con. of Laws, sec. 160, p. 143 to 187, inclusive, Gales vs. Davis' heirs, 4 Martin's R., 645, 649; Saul vs. his Creditors. (17 ib., 605.)

5th. Each State of the Confederacy being sovereign, has the exclusive right to control the disposition of its soil.

6th. Personal property of an intestate, must be distributed by the laws of the country of the domicil. 3 Cranch, 319. But as regards real property, it is an unquestionable principle of general law, that the title to, and disposition of it, must be exclusively subject to the laws of the place where it is situated. Kerr vs. Moore, 9 Wheaton, 565; the U. States vs. Crosby, 7 Cranch, 115; Robinson vs. Campbell, 3 Wheaton, 212; McComick vs. Sullivan, 10 Wheaton, 192; Society for the propogation of the Gospel vs. Wheeler, et al, 2 Gollison, 105; Clark vs. Graham, 6 Wheaton, 577; Thatcher vs. Powell, 6 Wheaton, 119; Jackson vs. Chew, 12 Wheaton, 153; Darby vs. Mayer, 10 Wheaton, 469.

*Isaac Depas* vs. *Peyton R. Mayo & Wife.*

CROCKETT & BRIGGS AND SPALDING & TIFFANY, *for Appellees.*

1. There is a mistake in the statement of the appellant. In the record made a part of the bill, the appellant, Depas, was made a party, being summoned by the Sheriff. A decree was pronounced of divorce, on 16th June, 1842. Afterwards on 3d July, 1844, the record states that *"by consent,* and in open court," testimony was taken; and the entry is *"this cause was this day taken up by consent of the parties.*              A. BODIN, ESQ., *for Plaintiff,*
Z. LATOUR, ESQ., *for Defendant.*

After hearing counsel, the court," &c., and then follows the final decree from bonds of matrimony. So that it seems, not only that the writ was served, but the party complainant was present by counsel, at the final hearing and decree.

2. The domicil of marriage was Louisiana. The complainant's counsel admits this, and the estate of the community, on the dissolution of it, is to go according to the laws of said domicil.— Story's Con., sec. 170, 171, a, 186.

3. It is therefore claimed that even if the law of the matrimonial domicil does not govern as to the lot in question, yet the wife is to be considered as having an equity in the same, on the ground of the fraud.

4. If the general rule be that the law of the matrimonial domicil is to govern as to personalty, as the authorities seem to shew conclusively, then it is contended, that in this case, this investment is to be considered as of personalty, and the lot itself *personalty,* as regards this action; not being an *acquisition* but an *investment.*

5. And further, that the time of the residence in Missouri, is not to be held as a domiciling in another country; but as an expedition,—an adventure. The man brought up some merchandise,—bought the lot,—sold out his goods,—and returned.

NAPTON, J., *delivered the opinion of the Court.*

This was a proceeding in chancery by Mayo & wife against Depas, to enable them to get the benefit of an alleged equitable interest in a lot of ground in the city of St. Louis. The facts stated in the bill are substantially as follows:

Sarah S. Essex, (now Mrs. Mayo) originally resided in Philadelphia, where she was married to Isaac Depas of New Orleans. At the time of the marriage, it was the design of the parties to make New Orleans their place of residence, and they accordingly proceeded to that city immediately after their marriage, and continued to reside there for several years. Both parties at the time of their marriage were destitute of property, but by their joint exertions, they succeeded in accumulating a considerable estate. By the laws of Louisiana, it is stated, one half of all the property acquired during the coverture, belongs to the wife, and cannot be conveyed by the husband or otherwise disposed of, so as to defeat the wife's interest, nor is it subject to the husband's debts. In 1838, Depas and his wife removed to St. Louis, taking with them a considerable amount of money and property, acquired by their joint indus-

try in New Orleans, as before stated, and soon after their arrival, Depas purchased with the money aforesaid, a lot in the city of St. Louis, and took the title in his own name. The parties continued to reside in St. Louis for several years and then returned to New Orleans. After their return to New Orleans Depas became intemperate in his habits and was guilty of brutal conduct towards his wife, so that in 1841, she was compelled to apply for a divorce in the courts of that State.. The Parish Court of New Orleans, which had jurisdiction of this matter, directed a monthly alimony of sixty dollars during the pendency of the suit. Process was served on Depas on the 31 July, 1841, and on the 9th July, 1844, a final decree was pronounced, divorcing the parties. Depas never paid the alimony, but to defraud his wife and prevent its collection, disposed of all his property, so as to place it beyond the reach of legal process.

Upon this statement of facts, the complainant, Mrs. Mayo, bases the following claims:

1. That New Orleans being the place of the matrimonial domicil, by the laws of Louisiana all estate acquired subsequent to the marriage, was held in community, and the complainant was entitled to one-half thereof, on the dissolution of the marriage.

2. That the property in St. Louis having been paid for out of the funds of the community, the complainant acquired a resulting trust therein to the extent of one-half of the property.

3. That said Depas having since squandered and fraudulently disposed of all the remainder of the estate held in community, he is liable to the complainant for one-half thereof, and his interest in said St. Louis property should be attached and subjected to this demand.

4. That under all circumstances, the complainant is entitled to alimony out of his estate, and the St. Louis property should be subjected to this demand.

In accordance with these propositions, the bill prays, that an account be taken of the property held in community, and Depas be held accountable for one-half thereof, and that his interest in the St. Louis property be subjected to this demand; and further, that the resulting trust of complainant in said property be enforced, and Depas be decreed to convey the legal title to one-half of said property, and surrender the possession thereof; and lastly, that Depas be ordered to pay the complainant the monthly sums ordered by the Parish court of New Orleans as alimony, with interest, and such other alimony be decreed as the court may deem reasonable, and that said St. Louis property be subjected to the payment thereof. There is also a prayer for general relief.

The record of the suit before the Parish court of New Orleans was made a part of the bill. From this, it appeared that Mrs. Depas presented her petition for a separation from bed and board, preliminary to a divorce, and for an account of the acquests and gains composing the matrimonial community between the parties, and that in the meantime Depas be enjoined from disposing of them. This petition was presented in 1841, and the order was made for alimony during the pendency of the suit. Personal notice was served on the defendant 3rd July, 1841. On June 20, 1842, a judgment of separation from bed and board was pronounced, and the parties were referred to a notary public for the settlement of their community. On the 3rd July, 1844, a divorce *a vinculo matrimonii* was pronounced.

To this bill a demurrer was filed, in which the following grounds are taken: That the bill contains no equity; that as to the claim for alimony, allowed by the Parish court of New Orleans, the defendant had no notice, and if he had, the remedy at law is complete and adequate; that as to the account of the community property, prayed for in the bill, this claim was made before the Parish court aforesaid, and was tried and determined in said suit.

The demurrer, as to so much of the bill as related to recovery for alimony, was sustained, and as to the residue of the bill, the demurrer was overruled. By agreement of the parties, that part of the bill not dismissed, was taken as confessed, and by consent the court entered up a decree at that term, in which the facts were found as stated in the bill, and an account ordered in respect to the St. Louis property, directing the defendant to account for the same according to its value on the 25th June, 1841, and for the increased value of the property, and the rents and profits from the date aforesaid to the time of taking the account, and the same was referred to a commissioner. (The report of the commissioner was ultimately approved by the court.)

There can be no doubt that the law of this State must decide all questions concerning the title, either legal or equitable, to the lots in St. Louis. It is in relation to this property alone, that there seems to be any controversy; for, although the bill prayed an account of the whole community estate, the decree was confined to so much as had been invested in land here.

"The rule as to the law of domicil," says Abbott, C. J., in Brithwhistle vs. Vardell, (5 B. & C., 438) "has never been extended to real property; nor have I found in the decisions of Westminster Hall any doctrine giving countenance to the idea that it ought to be so extended. There

being no authority for saying, that the right of inheritance follows the law of the domicil of the parties, I think it must follow that of the coun- try where the land lies." It is a settled rule of the common law, that in relation to land, the capacity to alienate or to take—the mode and form of alienation, either testamentary or *inter vivos*—and the rules of inheritance, are regulated by the law of the place where the land is sit- uated. Story Conf. L., s. 435, et seq.

It must be assumed then, that Mrs. Depas was, by the laws of Lou- isiana, entitled to one-half of the estate, both real and personal, belong- ing to the community of which her husband was the head, and that De- pas, upon his removal to St. Louis, invested a portion of this community property in real estate. Did he acquire, by this investment, an equitable as well as a legal title, to the real estate thus purchased, or is he still to be regarded as a trustee for his wife, to the extent of her interest in the fund by which the purchase was effected? This question, as we have said, must be determined by our law, and not by the law of Louisiana. Now according to the law in this State, if A. purchases land with the money of B., and takes the legal title to himself, a court of equity will regard him as a trustee, unless there be something in the circumstances of the transaction, or the relation of the parties, to rebut such a pre- sumption. Here the relation of the parties was that of husband and wife. If the wife has separate property, not secured from the control of the husband by the intervention of a trustee, the husband is by our law the trustee of the wife's property. If in such a case the property is personal, and the husband invest it in land, taking the title in his own name, can it be doubted, that the equitable rights of the parties are not changed by the change of property and legal ownership?

The removal of Depas and his wife from Louisiana to this State, does not alter the character of this transaction. Had Depas, whilst residing in Louisiana, remitted a sum of money, belonging to the community, and procured its investment in Missouri lands, would the rights of the par- ties in Louisiana have been changed? What difference can it make, that previous to the investment, the parties had changed their domicil. The bill assumes that the purchase of lots in St. Louis was not an *acquisition here*, but a mere investment of money previously acquired in Louisiana. It was a change of the character of the property from personalty to realty. It is admitted that the wife was entitled to one-half the money with which the purchase was made.

There may be cases in which the facts would show a consent on the part of the wife to the change in the character of the property, which

would have the effect of divesting her of her separate estate. Such seems to have been the case in Kneeland vs. Ensley, (Meigs' R., 629,) which has been cited by the counsel for the appellant. The husband in that case, by virtue of a power of attorney of his wife, without qualification, and without any agreement that the property should be held for her separate use, became possessed of certain property, previously belonging to her. A reception of the property, under such a power of attorney, which we must presume to have been executed in such a mode as by the laws of Tennessee bound the wife, was considered as divesting the wife, and converting the property into the absolute property of the husband. But here is no consent proved, and none to be presumed from the facts. If a mere removal from Louisiana to this State implies a consent on the part of the wife, that all their previous joint acquisitions in Louisiana should, after their change of domicil, become the absolute property of the husband, subject only to such contingent rights of dower as the laws of this State might secure, the learning of the books on the effect which a change of domicil has upon the rights of parties, must be superfluous.

The other Judges concurring, the decree is affirmed.