654 So.2d 1 (1995)
Kathy Ann Peek PALMER
v.
Richard Warren PALMER.
No. 92-CA-01122-SCT.
Supreme Court of Mississippi.
February 9, 1995.
Robert H. Pedersen, James A. Becker, Jr., Watkins & Eager, Jackson, for appellant.
Jefferson D. Stewart, James L. Halford, Brunini Grantham Grower & Hewes, Jackson, for appellee.
En Banc.
SULLIVAN, Justice, for the Court:

I.
The Palmers were divorced in Louisiana on October 6, 1990. In a "Partial Community Property Settlement," dated October 10, 1990 all property acquired during the marriage was divided except the oil and gas interest in Wayne and Yazoo Counties, the record ownership of which was held in Richard's name only. Similarly acquired oil and gas properties in the states of Texas, Arkansas, and Louisiana were treated as community property and divided equally, one-half being the property of Kathy and one-half being the property of Richard. All oil and gas properties in Mississippi were acquired by Richard using community property funds.
By agreement, the parties submitted the Mississippi oil and gas properties ownership question to the Wayne County Chancery Court for resolution. Following trial, the Chancellor applied divorce law and ruled Kathy was not entitled to an "equitable distribution" based upon the factors in Retzer v. Retzer, 578 So.2d 580 (Miss. 1991). The chancellor, after tracing the community property funds to the acquisition of the Mississippi oil and gas properties, refused to apply Mississippi law providing for a resulting or constructive trust. Had the Chancellor correctly applied the law, Kathy would have been entitled to an undivided fifty percent (50%) interest in the oil and gas properties located in Mississippi. Instead, the chancellor incorrectly applied divorce law when the chancery court had no jurisdiction over the divorce which had already been granted to the parties in the State of Louisiana. The chancellor incorrectly treated the case as an equitable distribution action between married spouses traditionally originating in a divorce proceeding. It should be remembered that Richard filed the action in chancery court seeking to remove a cloud on the oil and gas properties in Mississippi. Kathy defended and by counterclaim sought a judicial determination that she was entitled to an undivided one-half interest in those properties under the theory of resulting or constructive *2 trust. Clearly, Mississippi law applied which required imposition of the trust once community property funds accumulated during the marriage of the parties in Louisiana was traced and found to have been utilized to purchase that property.

II.
This Court has applied the equitable theory of resulting or constructive trust to protect the community property interest of a wife in real property acquired in Mississippi solely in the husband's name. In Stone v. Sample, 216 Miss. 287, 62 So.2d 307, 308-09 (1953), this Court was dealing with these facts:
About the year 1940 Sample purchased certain mineral rights in this State. He was then, and for many years had been, a married man and a resident citizen of Texas. The money used by him in purchasing the mineral interests belonged in equal parts to himself and his wife as community property under the laws of Texas. The conveyances were to Sample alone.
Sample argued that he held legal title to the minerals in trust for himself and his wife. Thus:
half of the purchase price of the minerals was the property of Mrs. Sample, then a trust resulted in favor of Mrs. Sample and he holds title in trust to her one-half interest... . Here, she was owner by virtue of the community laws of Texas... . The source of her title, or ownership, is immaterial.
... .
The commission invokes the rule that real property is controlled by the law of its situs. That, of course, is true. This is not an effort to transport the Texas community law into this state. The title of Mrs. Sample to a half interest in the property in Mississippi does not result from application of the community law of Texas to the real property in Mississippi. The trusteeship comes about as a result of using her money in the purchase of the property regardless, as above stated, how and where she acquired title to the money. (Emphasis supplied).
Id. 62 So.2d at 308-09.
In Texas, as in Louisiana, that produced by the labor of either spouse is community property. La.Civ.Code, Art. 2338.
Cases involving questions of resulting trusts have often been before this court. The following principles are recognized and declared by this court: If one buys land in the name of another and pays the consideration therefor, the land will be held by the grantee in trust for the benefit of him who advances the purchase money; ... The foundation of trust in such cases is that the property really belongs to him whose funds have paid for it... . Property rights are not lost simple because property is transported into another state and exchanged there for other property.
Stone v. Sample, 62 So.2d at 310.
LSU law professor Joseph Dainaow limits the impact of Pennison v. Pennison, 157 So.2d 628 (La. App. 4th Cir.1963) by stating:
[T]here were a number of problems concerning child support and the separation of community property after a divorce so that the one point of conflicts of law may have been relatively unimportant, but its treatment was unduly summary.

The land was in Mississippi and the court applied the presumed Mississippi law vesting title in the husband. However, in so doing there was not a sufficient inquiry into the law of the state in which the land was situated. While in the instant case, it may not have made any difference, in the ultimate legal or practical result, the problem calls for a more complete analysis which may lead to different results where there has been a significant change in the value of the property (for example, by the discovery of oil).
An actual illustration of what is meant by further inquiry into the lex rei sitae is found in the Missouri case of Depas v. Mayo [11 Mo. 314, 49 Am.Dec. 88 (1848)]. After accumulating their wealth in Louisiana, the husband and wife moved to Missouri, where the husband used some of these community funds to purchase land, *3 taking title in his own name. Later, they were divorced, and the wife sued in Missouri for a half-interest in this land. Applying the Missouri lex rei sitae, the court there found that a person who purchases land with money of another takes legal title in trust. Since the purchase money had been community funds, the court declared a resulting trust in one-half of the land in favor of the wife and recognized her half interest in the property.
25 La.L.Rev. 391-92 (Feb. 1965).
Pennison merely held that Louisiana community property law does not cross state boundary lines. It did not determine the applicable Mississippi law and apply it. If the Louisiana Court of Appeals in 1963 had looked, it would have found that this Court had applied the equitable theory of resulting or constructive trust to a similar fact situation ten years earlier in Stone v. Sample.
The treatise writers are in agreement that a resulting or constructive trust is available to protect community property funds used to purchase land titled only in one spouse. The Restatement (Second) of the Law of Conflicts, § 234 (1971) provides:
§ 234. Effect of Marriage on an Interest in Land Later Acquired.
(1) The effect of marriage upon an interest in land acquired by either of the spouses during coverture is determined by the law that would be applied by the courts of the situs.
(2) These courts would usually apply their own local law in determining such questions.
Illustration:
1. H and W, husband and wife, are domiciled in state X, a community property state. With community funds, H purchases in his own name land in state Y, a common law state. If the Y courts, despite the fact that community property is unknown to their local law, would hold that the wife, W, has the same interest in the land as she had in the funds with which the land was purchased, the courts of all other states will hold likewise.
The fact situation used in the hypothetical illustration is the same fact situation existing in this case.
In Marital Property in Conflicts of Law by Harold Marsh § 2, entitled Community Property Taken Into a Common-law State, he discusses at length fact situations analogous to the one in issue. In analyzing the Missouri case of Depas v. Mayo discussed above, he concludes:
The court held that the husband was a "constructive trustee" for the wife as to one-half of the property after the divorce. Since Missouri does not have community property, its procedure of course does not contain the same remedies for protecting the interest of the wife which would be available in Louisiana; but the device of a constructive trust is capable of being used to enforce the kind of rights which the wife had under Louisiana law, and it should be used flexibly for that purpose.
H. Marsh, Jr., Marital Property in Conflicts of Law, § 2 (1982).
In Conflicts of Law by Eugene F. Scoles in Section 14-6, entitled B. Land Acquired After Marriage, he states:
The acquisition of land usually calls into operation an important practical limitation on the effect of the assumed situs reference: the tracing rule that marital rights in assets used to purchase land will be recognized in the land after purchase. (Emphasis supplied)
Following a review of the New Mexico Supreme Court decision in Hughes v. Hughes, 91 N.M. 339, 573 P.2d 1194 (1978), he opines:
Thus, the marital interest which attaches to movable assets acquired by the spouses according to the law of their domicile at the time of acquisition is recognized and traceable into real property located in another state in which those assets are invested. This has been the consistent result under the cases.
The reason generally given for the tracing rule is that one's title to money, or other assets, is not lost by moving it across a state line and turning it into some other form of property... . However, the leading *4 California case rested its decision on constitutional grounds that property rights vested under the prior marital domicile could not be altered simply by moving the assets into a community property state. The approach taken in this line of authority is consistent with the longstanding theories of equitable tracing to achieve justice and equity among the parties in interest. The same approach has been applied to land purchased in a common law jurisdiction with the separate or community funds of spouses domiciled in a community property state.... If, however, the land is purchased by one of the spouses with community funds in that spouse's name only, the interest of the other spouse persists and enables that spouse to follow, by constructive trust principles, the community interest in the land acquired with community assets. The leading American case involved a husband who wrongly took funds belonging to the community from Louisiana and invested them in Missouri land, taking title in his own name. The husband was compelled to hold the title in trust to protect the wife's interests. [Depas v. Mayo, 11 Mo. 314, 49 Am.Dec. 88 (1848)] (Emphasis supplied)
The chancellor erred by applying Pennison authoritatively. Once the trial court found that Richard had used community property to acquire the Mississippi oil and gas interests, the requisite tracing was done. Application of Mississippi law required that Kathy be awarded an undivided fifty percent (50%) interest on the theory of resulting or constructive trust. Stone v. Sample, 216 Miss. 287, 62 So.2d 307 (1953). Richard's trial counsel were successful in confusing the issue and getting the chancellor to run the "equitable distribution" rabbit. "Equitable distribution" applies only in marital cases involving lump sum alimony and property division questions between divorcing spouses. The case before the chancellor was Richard's complaint to remove a cloud on title and Kathy's equitable claim for an undivided one-half interest based upon the theory of resulting or constructive trust. The parties had already been divorced by the appropriate court in the state of Louisiana.

III.
The Chancellor erred as a matter of law. Kathy is entitled to an undivided one-half interest in the oil and gas properties held in Richard's name. The judgment of the Chancery Court of Wayne County is reversed and judgment is rendered here awarding Kathy Ann Peek Palmer an undivided one-half interest in the Mississippi oil and gas properties located in Wayne and Yazoo Counties.
REVERSED AND RENDERED.
HAWKINS, C.J., PRATHER, P.J., PITTMAN, BANKS, McRAE, JAMES L. ROBERTS Jr. and SMITH, JJ., concur.
DAN M. LEE, P.J., dissents with separate written opinion.
DAN M. LEE, Presiding Justice, dissenting:
The majority's opinion states that the chancellor traced community funds to Richard Warren Palmer's acquisition of the Mississippi oil and gas leasehold interests. This statement is not completely correct. On the contrary, the chancellor found that no funds of the couple, community or otherwise, were used to purchase or acquire the Mississippi oil and gas leasehold interests at issue.[1] The majority's dependence on an erroneous reading of the facts yields a legal misconception in the case sub judice. Consequently, I respectfully dissent.
Richard Warren Palmer ("Ricky") and Kathy Ann Peek Palmer ("Kathy") were married on August 31, 1978. A few years later, Richard went to work for Palmer Petroleum, Inc., a company formed by his father, John T. Palmer, in 1977, and in which Ricky acquired one-third of the stock of the company at the time that it was formed.
In the early stages of Ricky's accumulation of oil and gas properties, John T. Palmer loaned Ricky the money to pay the initial costs and expenses of exploration and development of wells. The chancellor found that:

*5 8. Between 1980 and 1986, Palmer Petroleum, Inc., booked and developed oil and gas prospects located in the states of Texas, Louisiana and Arkansas.
9. In 1980, Richard began investing in those prospects with the help of his father, John T. Palmer, who would pay Richard's expenses for drilling the wells in those prospects, treating those expenses as a loan. John T. Palmer helped Ricky by advancing him money to get started investing in oil and gas properties. Between 1980 and 1982, John T. Palmer paid on Ricky's behalf, monthly well and prospect expenses for certain oil and gas properties in Arkansas, Louisiana, and Texas, and those properties were placed in Ricky's name. Over this three-year period, John T. Palmer paid oil and gas expenses and costs on behalf of Ricky in the amount of $224,019.88. The John T. Palmer advances to Ricky have been treated as a loan by the parties and referred to as the "John T. Palmer" loan... .
Unlike the loan that was made exclusively to Ricky from his father and which provided the seed capital for the early acquisition of oil and gas properties, once John T. Palmer discontinued advancing his son money for the prospects, Ricky and Kathy both signed promissory notes for the acquisition of, and expenditures on, oil and gas properties, secured by existing oil and gas properties titled in Ricky's name. Had the early prospects resulted in "dry holes" or unprofitable ventures, there is no indication that Kathy would have been liable for the repayment of the John T. Palmer loan. The promissory notes, lines of credit and continuing guaranties later signed by Kathy and Ricky represented Kathy's first exposure to liability associated with the oil and gas ventures.
None of the properties securing the promissory notes signed by Kathy and Ricky were Mississippi oil and gas properties, nor were the funds from the loans on which Kathy was liable used to purchase Mississippi oil or gas prospects. Furthermore, all of the non-Mississippi prospects connected with those loans were divided equally between Ricky and Kathy, including eighty-nine (89) producing wells located in Texas, Louisiana and Arkansas. The chancellor stated in his Findings:
20. None of the funds from these loans were used to acquire or to pay expenses associated with the Mississippi prospects.

21. Between 1982 and August 10, 1988, the date on which the community property was separated, Ricky acquired in his name, oil and gas prospects in several states [Alabama, Arkansas, Colorado, Louisiana, Texas, and Wyoming]... .
... .
All of these prospects were divided equally between Kathy and Ricky in the Partial Community Property Settlement. [emphasis added]
The crux of the dispute lies with Palmer Petroleum, Inc., prospects located in Mississippi that were identified or generated in 1983 through 1988. As found by the chancellor:
24. Between 1983 and 1988, fourteen oil and gas prospects in Mississippi were placed on the Palmer Petroleum Company books. Eleven of those prospects have been condemned. Producing wells have been drilled on three of the prospects and those prospects, and the producing wells, are the only Mississippi properties that are at issue in this case.
Palmer Petroleum drilled and completed those three wells without the aid of any funds whatsoever from Kathy or Ricky. However, because of an employee incentive program of Palmer Petroleum in which Ricky and the other upper management of that company participated, Ricky received an assignment of a fractional leasehold interest in each of the three wells and the remainder of the prospect on which each of those wells were drilled.
On appeal, Kathy erroneously argues that community funds were used to acquire the disputed Mississippi leasehold interests. Accordingly, Kathy argues that this Court should apply the equitable doctrine of resulting or constructive trust and award her fifty percent (50%) of the Mississippi leasehold property owned by Ricky.
*6 This Court in Stone v. Sample, 216 Miss. 287, 62 So.2d 307 (1953), applied the theory of resulting or constructive trust to protect the community property interest of a wife in real property acquired in Mississippi and titled solely in her husband's name. In Stone, the proof established that the funds used by Mr. Sample to purchase the Mississippi real estate were taken from a community account belonging to Mr. Sample and Mrs. Sample. Stone, 216 Miss. at 291, 62 So.2d at 308. This Court found:
[T]hat half of the purchase price of the minerals was the property of Mrs. Sample and he holds title in trust to her one-half interest.
Id.
Later this Court addressed the Commission's argument that the Samples were attempting to apply Texas community property law to Mississippi real property. The Court stated:
The title of Mrs. Sample to a half interest in the property in Mississippi does not result from application of the community law of Texas to the real property in Mississippi. The trusteeship comes about as a result of using her money in the purchase of the property regardless, as above stated, [of] how or where she acquired title to the money.

Stone, 216 Miss. at 293, 62 So.2d at 309. See also Leininger v. Leininger, 705 F.2d 727 (5th Cir.1983).
This Court has stated on many occasions that the existence of a constructive trust must be proved by clear and convincing evidence. See Calcote v. Calcote, 583 So.2d 197, 199 (Miss. 1991); Planters Bank & Trust Co. v. Sklar, 555 So.2d 1024, 1034 (Miss. 1990); Allgood v. Allgood, 473 So.2d 416 (Miss. 1985).
In Stone, we held that Mr. Sample was not estopped from asserting joint ownership of income earned from Mississippi real estate titled solely in his name, where both parties recognized that the property was owned jointly and where Mrs. Sample had not been misled or enticed to act in such a manner that was to her detriment. In the case sub judice, Ricky and Kathy did not recognize that the Mississippi leasehold interests were jointly owned. Likewise, the record does not indicate that Kathy had been misled or enticed to act in any such way that might have been detrimental to any asserted interest that she might have had in the Mississippi leasehold interests. Therefore, Kathy did not, at trial, establish by clear and convincing evidence the requisite facts necessary to establish a resulting or constructive trust.
Testimony at trial and the chancellor's Findings revealed:
37. Richard Palmer paid no funds to acquire his interest in these prospects under these agreements.

38. Under these agreements [Employee Incentive Plan], Richard Palmer paid no funds to participate in the drilling of the exploratory well under each of these prospects.

39. After the successful drilling of the discovery well in each prospect, Ricky Palmer was unconditionally entitled to a leasehold interest in the producing wells developed in that prospect. [emphasis added]
Consequently, Ricky acquired his assignment of the oil and gas leasehold interests at issue without expending any community funds whatsoever. It is those oil and gas leasehold interests in which Kathy claims an interest. Those are also the same oil and gas leasehold interests that the majority erroneously states that community funds were used to acquire.
The majority's confusion arises from the failure to recognize the distinction between Ricky's acquisition of title to the oil and gas leasehold interests in each prospect and his subsequent obligation to pay the completion costs and operating expenses on the discovery well, as well as his obligation to pay for the drilling and completion costs of development wells within the prospects. As the chancellor stated, Ricky did not incur any drilling costs on the discovery well of each prospect  Ricky received a "carried interest" or "free ride" on each of the three discovery wells. Nor was he required to pay anything for the oil and gas leasehold interest assigned to him after the discovery well was successfully completed. But, once the assignment was made to Ricky, he possessed *7 title to the fractional oil and gas leasehold interest which he was assigned.
Nevertheless, after the assignment, Ricky was obligated to pay the completion costs and monthly operating expenses for each discovery well. Furthermore, if Ricky desired to participate in a development well, he was required to pay the proportionate costs to drill and complete each development well, as represented by the oil and gas leasehold interest which he owned in the prospect, acquired through the assignment after the discovery well. This proposition was succinctly revealed by the chancellor, who stated that:
40. Under those agreements, Richard was obligated to pay a certain percentage of the expenses incurred for development wells in each prospect based on the specific percentages set forth in each agreement. [emphasis added]
41. Richard paid for those expenses out of a bank account known as the "Richard W. Palmer Business Account."
42. This account was a separate account in the name of Richard W. Palmer.
43. Kathy Peek Palmer had no right to draw out funds of this account and never made deposits in this account.
However, the money funding the "Richard W. Palmer Business Account" was derived from various sources, some of them arguably community in nature. Nevertheless, no community funds were used to acquire the title to the oil and gas leasehold interests. At best, community funds were only used to pay for the completion costs and operating expenses on the discovery wells, and to pay for the drilling and completion costs on the development wells. Consequently, Kathy would be a creditor, owed the amount of money attributable to her community interest that was paid for completion costs and operating expenses on the discovery wells, and the cost to drill and complete the development wells. See Pennison v. Pennison, 157 So.2d 628 (La. App. 1963).
A fortiori, Kathy did not prove by clear and convincing evidence that community funds were used to acquire the disputed leasehold interests held in Ricky's name. In fact, the chancellor correctly found that Ricky paid no funds to obtain the Mississippi leasehold interests. Therefore, Kathy did not prove by clear and convincing evidence the existence of a constructive or resulting trust in the Mississippi leasehold interests owned by Ricky.
The chancellor erroneously analyzed the situation as if equitable distribution concomitant to a divorce applied in this situation. The case sub judice is not a divorce action.
To establish a constructive trust, Kathy should have demonstrated that her funds were used to purchase the Mississippi real estate. Necessarily, the chancellor looked to Louisiana law to determine whether Kathy's funds were used to purchase Mississippi realty. The chancellor cited Pennison v. Pennison, 157 So.2d 628, 631 (La. App. 1963), and found it to be dispositive to the case sub judice. The Louisiana Court of Appeals in Pennison, when faced with a situation analogous to the case sub judice, correctly stated:
The property in Waveland, Mississippi, was bought by the husband in his own name for the sum of $600 in cash taken out of community funds. This property belongs to his separate estate. The common law prevails in Mississippi, and to that system of law the community of acquets and gains between spouses is unknown. Lewis v. American Brewing Co., La. App., 32 So.2d 109. [(La. App. 1947)] Our community laws of Louisiana do not operate on real estate in another state or country. Nott v. Nott, 111 La. 1028, 36 So. 109. [(La. 1904)] The property forms no part of the community, but the community should be regarded as the husband's creditor for the advance of $600 with which he paid the purchase price. (emphasis added).
Pennison has not been overturned by any court in Louisiana and is still a correct statement of the law. The community property laws of Louisiana do not apply to real property located in Mississippi. Therefore, the chancellor did not commit reversible error in relying on Pennison in reaching his decision. Kathy did not prove by clear and convincing evidence that she could "trace" any of her funds to the purchase of the Mississippi *8 leasehold interests because none of her funds were used to purchase the property, and for that reason, Kathy's claim for a resulting or constructive trust must fail.
Accordingly, I respectfully dissent.

APPENDIX

IN THE CHANCERY COURT OF WAYNE COUNTY, MISSISSIPPI

CAUSE NO. 18,840

Filed Sept. 29, 1992

Richard Warren Palmer Plaintiff

Versus

Kathy Ann Peek Palmer Defendant

OPINION OF THE COURT
This matter is before the Court on the Plaintiff's, Richard Warren Palmer, Complaint requesting that the Court remove as clouds on title any claim the defendant, Kathy Ann Peek Palmer, may have to certain oil, gas and mineral interests located in Mississippi, together with the Answer and Counter-Claim seeking a one-half interest in the Mississippi properties. The Court, having received all of the evidence offered by the parties, and written argument of counsel, finds as follows:

FINDINGS OF FACT
Plaintiff Richard Warren Palmer ("Ricky") asks this Court to remove as a cloud the claim defendant Kathy Ann Peek Palmer ("Kathy") makes to certain oil and gas properties located in Mississippi. Kathy's answer denies that Ricky is entitled to the relief he requests, and her counterclaim asks the Court to order Ricky to convey to her a one-half interest in the Mississippi oil and gas properties, or to convey to her such interest as the Court determines she is entitled to receive.
1. Richard Warren Palmer and Kathy Ann Peek Palmer are adult resident citizens of Shreveport, Louisiana. They were married on August 31, 1978, at the age of 20 and 21, respectively. Three children were born to the marriage. They were legally separated on August 10, 1988. At all times they have both been residents of Louisiana.
2. On November 30, 1988, a Judgment of Separation was entered by the Louisiana court dissolving the community property that existed between Kathy and Ricky under Louisiana law. That order provided that judgment was being entered in favor of Ricky "based upon the legal fault of defendant Kathy Ann Peek Palmer" and also found "that Richard Warren Palmer is not free from fault for purposes of alimony after divorce pursuant to Article 160 of the Louisiana Civil Code."
3. On October 6, a Judgment of Divorce was entered dissolving the marriage. On October 10, 1990, Ricky and Kathy signed a Partial Community Property Settlement which was filed with the Louisiana court. That agreement contains a partition of the community estate that existed between Ricky and Kathy during their marriage. In paragraph V of that agreement, Ricky and Kathy agreed to present to this Court the question of ownership of certain oil and gas properties located in Mississippi.
3. At the time of the marriage, Richard, with a high school degree and one semester of college, was working as a field engineer with Lyons Petroleum.
4. After spending almost three years with Lyons Petroleum, Richard went to work for Palmer Petroleum, Inc., a company formed by his father, John T. Palmer. At the time he went to work for Palmer Production, Inc., Richard also owned one-third stock of that company, along with his two sisters.
5. Richard is still employed with Palmer Petroleum, Inc. and is currently Vice President and shareholder in the company.
6. Palmer Petroleum, Inc. was, and is, in the business of creating oil and gas prospects, promoting those prospects to investors, and drilling the ones that could be sold.
7. Palmer Petroleum, Inc. gave its high level employees and Palmer family members the opportunity to invest in the prospects that it booked. From 1980 until present, Richard by virtue of being a Palmer employee and the son of John T. Palmer, invested in *9 the Palmer prospects and received interests in all of the successful Palmer prospects.
8. Between 1980 and 1986, Palmer Petroleum, Inc. booked and developed oil and gas prospects located in the states of Texas, Louisiana and Arkansas.
9. In 1980, Richard began investing in those prospects with the help of his father, John T. Palmer, who would pay Richard's expenses for drilling the wells in those prospects, treating those expenses as a loan. John T. Palmer helped Ricky by advancing him money to get started investing in oil and gas properties. Between 1980 and 1982 John T. Palmer paid on Ricky's behalf monthly well and prospect expenses for certain oil and gas properties in Arkansas, Louisiana, and Texas, and those properties were placed in Ricky's name. Over this three-year period, John T. Palmer paid oil and gas expenses and costs on behalf of Ricky in the amount of $224,019.88. The John T. Palmer advances to Ricky have been treated as a loan by the parties and referred to as the "John T. Palmer" loan although a note was never signed prior to Ricky's and Kathy's divorce.
10. By 1983, Richard's oil and gas runs from earlier prospects in Texas were such that his father was no longer willing to advance expenses and required that he establish a line of credit.
11. In 1983, a line of credit with Louisiana Bank and Trust was established for these oil and gas investments with the help of and personal guarantee of John T. Palmer. On March 4, 1983, Ricky and Kathy obtained a $500,000 line of credit for the purpose of investing in additional oil and gas properties. He secured that line of credit with oil and gas properties he had acquired in Louisiana and Texas with the John T. Palmer loan. Kathy and Ricky signed the promissory note. Ricky acknowledged during his testimony that the Louisiana and Texas oil and gas properties used as security were community property, and these properties were equally divided in the Partial Community Property Settlement. Both Louisiana and Texas are community property states. Numerous other transactions involving this line of credit occurred over the next several months and years. Those transactions are detailed as follows:
(a) On February 6, 1984, Ricky signed an extension of the $500,000 line of credit from Louisiana Bank and Trust Company, and that extension was again secured by the Louisiana and Texas oil and gas properties. John T. Palmer did not sign as guarantor for that note.
(b) On April 23, 1984, Ricky borrowed $1,000,000 from Louisiana Bank and Trust Company in order to invest in a family partnership consisting of Mr. and Mrs. Palmer and their three children, Barbara, Ricky, and Susan. That partnership was a Texas partnership and was known as Palmer Interest Limited. John T. Palmer signed as guarantor for that note.
(c) On August 7, 1884 [1984], Ricky obtained an $800,000 line of credit from Louisiana Bank and Trust Company. To secure that line of credit, Ricky pledged oil and gas properties located in Texas which have been divided equally in the Partial Community Property Settlement and which Ricky acknowledged was community property. Kathy and Ricky signed the loan documents. John T. Palmer did not sign as guarantor for the line of credit.
(d) On August 7, 1984, Ricky signed a Promissory Note Cumulative Advance based upon the $800,000 line of credit, and that note was secured by the Texas oil and gas properties pledged to secure the $800,000 line of credit. John T. Palmer did not sign as guarantor for the $650,000 promissory note.
(e) On January 7, 1985, Ricky signed a Promissory Note Cumulative Advance renewing the $800,000 line of credit and that note was again secured by the Texas oil and gas properties previously pledged by Ricky and Kathy. John T. Palmer did not sign as a guarantor for the renewal of the $800,000 line of credit.
(f) On August 6, 1985, Ricky signed a Promissory Note Cumulative Advance renewing the Louisiana Bank and Trust Company line of credit but reducing its maximum limit to $400,000. This line of credit was again secured by the Texas oil *10 and gas properties previously pledged by Ricky and Kathy on August 7, 1984. John T. Palmer did not sign as a guarantor for this line of credit.
12. Kathy Peek Palmer was required, as a matter of policy by the bank, to execute the promissory notes, continuing guaranties, and mortgage on the Texas and Louisiana properties for this line of credit.
13. In late 1985 or early 1986, John T. Palmer decided to dissolve the family partnership known as Palmer Interest Limited and to establish another family partnership made up of only his three children, Barbara, Ricky and Susan, which was called B.R.S. and was a Louisiana partnership.
14. In early 1986, John T. Palmer also decided to move his own and his family's banking business from Louisiana Bank and Trust Company to First National Bank of Shreveport (now Premier Bank).
15. Ricky obtained a $1,500,000 line of credit with First National Bank of Shreveport (now Premier Bank) in February 1986. The funds from that line of credit were used to pay off three loans that Ricky had at Louisiana Bank and Trust. One loan was in the amount of $767,619 for Ricky's B.R.S. debt. The second loan was in the amount of $125,000 for renovation of Ricky's and Kathy's house. The third loan was for $86,739 which was the amount of the oil and gas investment line of credit. All three loans, totaling $979,358, were consolidated into a single line of credit with the Premier Bank.
16. Ricky and Kathy signed the $1,500,000 line of credit loan documents and secured the loan with oil and gas properties in Rusk County and Leon County, Texas. Ricky acknowledged these are community property, and they were divided equally in the Partial Community Property Settlement. John T. Palmer and B.R.S. Partnership each signed a continuing guaranty for the $1,500,000 line of credit.
17. On May 6, 1987; September 27, 1988; and September 13, 1989, Ricky and Kathy signed extensions for the $1,500,000 line of credit. Those extensions continued to be secured by the oil and gas properties in Rusk County and Leon County, Texas; and John T. Palmer and B.R.S. Partnership continued to sign as guarantors.
18. As a matter of bank policy, Kathy Peek Palmer was required to sign the promissory notes and mortgage related to the Premier Bank line of credit.
19. Although the John T. Palmer loan and the lines of credit used to pay expenses on these early oil and gas prospects were treated as "community debt" under Louisiana law, Kathy Palmer did not personally arrange any of these loans, make a payment on the loans, or draw money from the lines of credit.
20. None of the funds from these loans were used to acquire or to pay expenses associated with the Mississippi prospects.
21. Between 1982 and August 10, 1988, the date on which the community property was separated, Ricky acquired in his name oil and gas prospects in several states. The number of prospects acquired in each state during each year is listed below:

 1982 1983
 Arkansas - 5 prospects Arkansas - 1 prospect
 Louisiana - 9 prospects Louisiana - 5 prospects
 Texas - 13 prospects Texas - 17 prospects
 ____________
 Wyoming - 1 prospect 23 prospects
 ________
 28 prospects

*11
 1984 1985
 Louisiana - 8 prospects Florida - 1 prospect
 Texas - 13 prospects Louisiana - 12 prospects
 _________
 21 prospects Texas - 13 prospects
 _________
 26 prospects
 1986 1987
 Louisiana - 6 prospects Louisiana - 3 prospects
 Texas - 11 prospects Texas - 8 prospects
 ____________
 17 prospects Colorado - 3 prospects
 Arkansas - 1 prospect
 Alabama - 1 prospect
 ________
 16 prospects
 1988
 Louisiana - 4 prospects
 Texas - 4 prospects
 Arkansas - 3 prospects
 ____________
 10 prospects

All of these prospects were divided equally between Kathy and Ricky in the Partial Community Property Settlement.
22. Eighty-nine producing wells had been drilled on some of the oil and gas prospects in Texas, Louisiana, and Arkansas by the time Kathy and Ricky separated. The number of wells in each state are as follows:

 Texas - 58 wells
 Louisiana - 29 wells
 Arkansas - 2 wells

These wells were divided equally between Ricky and Kathy in the Partial Community Property Settlement.
23. During their marriage, Ricky acquired in his name stock in the following companies:
Henderson Pipeline Company, a Texas corporation
Eastex Management Company, a Texas corporation
Whitehouse Pipeline Company, a Texas corporation
AU Investments 8400 Line Avenue Partnership
Ricky and Kathy divided their interests in these companies equally in the Partial Community Property Settlement.
*12 24. Between 1983 and 1988, fourteen oil and gas prospects in Mississippi were placed on the Palmer Petroleum Company books. Eleven of those prospects have been condemned. Producing wells have been drilled on three of the prospects and those prospects and the producing wells are the only Mississippi properties that are at issue in this case.
25. The North Yellow Creek Prospect was booked in 1986 and given Prospect No. 86-27 and is located in Wayne County, Mississippi.
26. The Choctaw Prospect was booked in 1987 and given Prospect No. 87-08 and is located in Wayne County, Mississippi.
27. The Pickens Prospect was booked in 1988 and given Prospect No. 88-07 and is located in Yazoo County, Mississippi.
28. Exhibit P16 shows the expenses were paid through August 10, 1988, for the three Mississippi prospects and the wells drilled on them.
The total expense for the North Yellow Creek Prospect/Wells was $96,322.68. The total expense for Choctaw Prospect/Wells was $34,410.62. Total expense for Pickens Prospect/Wells was $944.93. Total expense for all prospects was $131,678.23.
29. Ricky claims his interest in the Mississippi properties through the eight assignments that he has attached as exhibits to his complaint. Three of the assignments cover the North Yellow Creek Prospect (P-13). Five of the assignments cover the Choctaw Prospect (P-14). One assignment covers the Pickens Prospect (P-15). Each of these assignments assigns an interest in Ricky's name and in the name of B.R.S. Partnership.
30. Ricky acquired the right to participate in the wells drilled in the North Yellow Creek Prospect because he was an employee of Palmer Petroleum and because he participated in Palmer Petroleum's Employee Incentive Interest Agreement dated October 1, 1986, which was introduced into evidence as Exhibit P-9.
31. Ricky acquired the right to participate in the wells drilled in the Choctaw Prospect because he was an employee of Palmer Petroleum and because he participated in Palmer Petroleum's Employee Incentive Interest Agreement dated March 1, 1987, which was introduced into evidence as Exhibit P-10.
32. Ricky acquired the right to participate in the wells drilled in the Pickens Prospect because he was an employee of Palmer Petroleum and because he participated in Palmer Petroleum's Employee Incentive Interest Agreement dated June 1, 1987, and Exploration Program Agreement dated March 1, 1988, which was introduced into evidence as Exhibit P-11.
33. The right to participate in the Employee Incentive Interest Agreement Program was part of Ricky's compensation, and that right was given to the heads of departments and managers at Palmer Petroleum. Each of the Employee Incentive Interest Agreements provided Ricky and the other parties to that agreement a certain interest in the after payout working interest for all prospects generated during the time designated in the agreement. The October 1, 1986, agreement applied to all prospects generated after July 1, 1986. The March 1, 1987, agreement applied to all prospects generated after March 1, 1987. The June 1, 1987, agreement applied to all prospects generated after June 1, 1987. Since the right to participate under the agreement was part of the employee's compensation, each of the agreements provided that each participant's percentage interest ended "after their employment with Palmer Petroleum, Inc. is terminated for any reason."
34. Richard personally supervised the drilling and completion of every well in those three prospects.
35. Richard entered into employee incentive agreements with Palmer Petroleum, Inc. to invest in the three successful Mississippi prospects.
36. The opportunity to enter those agreements was by virtue of Richard Palmer being an employee of Palmer Petroleum, Inc. and the son of John T. Palmer.
37. Richard Palmer paid no funds to acquire his interest in these prospects under these agreements.
*13 38. Under these agreements, Richard Palmer paid no funds to participate in the drilling of the exploratory well under each of these prospects.
39. After the successful drilling of the discovery well in each prospect, Ricky Palmer was unconditionally entitled to a leasehold interest and interest in the producing wells developed in that prospect.
40. Under those agreements, Richard was obligated to pay a certain percentage of the expenses incurred for development wells in each prospect based on the specific percentages set forth in each agreement.
41. Richard paid for those expenses out of a bank account known as the "Richard W. Palmer Business Account."
42. This account was a separate account in the name of Richard W. Palmer.
43. Kathy Peek Palmer had no right to draw out funds of this account and never made deposits in this account.
44. At the time the Mississippi properties were being developed, the money going into this account came from distributions to Richard Palmer from B.R.S. Partnership, oil and gas runs from the leases and wells in Richard's name in which he had previously invested, and from dividends of stock in companies owning and operating pipelines located in Texas.
45. The primary source of funds between 1986 through the date of separation was from distributions of B.R.S. Partnership.
46. No advances were made from the Premier Bank line of credit to pay for the Mississippi properties.
47. In October 1990, the parties entered into a Partial Community Property Settlement. In that Partial Community Property Settlement, the parties agreed that oil and gas properties in the states of Texas and Louisiana along with stock in the associated pipeline companies were community property and that each party was entitled to a one-half interest therein.
48. In the Partial Community Property Settlement, Richard Palmer agreed to give Kathy Palmer a one-half interest in certain wells and leasehold interests located in the state of Arkansas.
49. In the Partial Community Property Settlement, Kathy Palmer agreed to assume a portion of the Premier Bank line of credit debt as her share of community debt.
50. In the Partial Community Property Settlement, Kathy Palmer agreed to give up any interest in the residence of the parties in exchange for Richard Palmer's assumption of the entire loan balance to John T. Palmer.
51. At the time of her marriage, Kathy had a high school degree, had not attended any college, and was not working.
52. Kathy brought no real property, stocks, or other separate assets to the marriage.
53. Kathy studied for and got her real estate license in 1980. She went back to school between 1981-1985 and became a registered nurse.
54. After 1983, the family had a full time maid to take care of the three children and the house.
55. During the marriage Kathy Palmer never worked full-time. The most she earned as wages during the marriage was $3,000 in 1986.
56. At no time during the marriage did any of Kathy Palmer's wages go toward the acquisition or development of any oil and gas investments which were accumulated during their marriage and which she received in the Partial Community Property Settlement.
57. During her marriage Kathy did not spend any time working for Palmer Petroleum nor did she take any part in managing any of the oil and gas investments or company stock which Richard acquired through his opportunities at Palmer Petroleum.
58. During her marriage Kathy was not involved in any of the decisions as to whether or not to invest in oil and gas prospects or how to invest them.
59. Kathy Peek Palmer made no personal contribution, either in efforts, abilities, opportunities, or monies toward the accumulation of oil and gas properties acquired in *14 Richard's name, in any of the other states, or Mississippi.
60. Kathy Palmer made no significant contribution to the accumulation of the total wealth of Richard either by quitting a job to become a housewife or by assisting Richard in his business.
61. Kathy Palmer's separate income or separate estate, after the Partial Community Property Settlement, is substantial and, along with the child support and wages she is able to earn as a registered nurse, will provide her financial security.
62. The legal separation and divorce in this case was granted to Richard because of Kathy's wrong doing.

II

KATHY PALMER'S REQUEST FOR SPECIFIC FINDINGS OF FACT
Pursuant to Miss.R.Civ.P. 52 and Uniform Chancery Court Rule 4.01, defendant Kathy Palmer has asked the Court to make the following specific findings of fact or conclusions of law:
1. How and when did Ricky Palmer's interest or right vest in the Mississippi properties?
ANSWER: The interest vested as a result of the employee participation agreements. See paragraphs 30-33 above for the dates. However, Ricky made no investment nor he did he incur any obligation at that time.
2. What law applies to determine the nature of the funds used to acquire the Mississippi properties?
ANSWER: Specific finding made above about source of funds, but the Court considers the question to be whether or not Mississippi law applies to title to properties located in Mississippi, and the Court finds that it does.
3. If Louisiana law applies, were any "separate" funds used to acquire the Mississippi properties?
ANSWER: A hypothetical question (See answer to question 2); however, specific finding is made above about source of funds.
4. If Louisiana law applies, were any community funds used to acquire the Mississippi properties?
ANSWER: A hypothetical question (See answer to question 2); however, specific finding is made above about source of funds.
5. If Louisiana law applies to determine the character of the funds used to acquire the Mississippi properties, which party has the burden of establishing that the funds were "separate" property?
ANSWER: A hypothetical question (See answer to question 2); however, specific finding is made above about source of funds.
6. What burden of proof does the plaintiff have to establish his claim for removal of a cloud upon title to the Mississippi properties?
ANSWER: This is not a request for a specific finding of fact. The facts in this case are essentially without dispute, but the plaintiff must generally prove his case by a preponderance of the evidence. As to certain facets of the case the burden of proof is greater. All facts found by the Court in this case are supported by evidence sufficient to meet any required burden of proof, whether it be a "preponderance of the evidence"; "clear and convincing evidence"; or "beyond a reasonable doubt".
7. What are the specific elements of proof the defendant must present in order to establish a claim under a resulting trust, a constructive trust, and under the lump sum alimony legal theory?
ANSWER: This sounds like a exam question for a law student. The Court knows of no rule that requires the Court to answer such interrogatories, and to expound on those theories, other than what is contained in the Court's "Conclusions of Law". If the Court had a law clerk, it may consider assigning such a task to a law clerk to be answered, but under the circumstances the Court declines to write a treatise on this subject. A good discussion of trust theory can be read in Planters Bank & Trust Co. v. Sklar, 555 So.2d 1024 (Miss. 1990) and Allgood v. Allgood, 473 So.2d 416 (Miss. 1985), both of which are cited in defendant's brief.
*15 8. Were any funds from Ricky's salary and Kathy's wages used to acquire the Mississippi properties?
ANSWER: This has been specifically found above, but to answer again, Kathy never contributed anything from her wages to the business. Neither did any of the funds come from Ricky's salary. The principal source of funds in the Richard W. Palmer Business Account was the B.R.S. Partnership, along with some runs from the Texas and Louisiana properties. The money from salaries of both Ricky and Kathy went into the household account.
9. Were any funds from Ricky's and Kathy's community oil and gas properties used to acquire the Mississippi funds?
ANSWER: Yes; funds derived from those sources.
10. Were any funds from the $1,500,000 line of credit used to acquire the Mississippi properties?
ANSWER: No
11. Were any funds from Ricky's and Kathy's interest in Henderson Pipeline Company, Eastex Management Company, Whitehouse Pipeline Company, AU Investments, or 8400 Line Partnership used to acquire the Mississippi properties?
ANSWER: Yes; funds derived from those sources.
12. Were any funds from the B.R.S. Partnership distributed to Ricky used to acquire the Mississippi properties?
ANSWER: Yes; funds derived from those sources.
13. What contributions, if any, did Kathy make toward the acquisition of the Mississippi properties?
ANSWER: None.

CONCLUSIONS OF LAW
This case has been extremely well presented by both parties. Well reasoned briefs have been prepared for the Court. The facts, as found above, are complicated in the sense that many separate transactions are involved.
While numerous authorities are presented and analyzed by each attorney to support his clients position, the basic issue in this case is a narrow one. Bottom line, the issue is whether or not property acquired in a community property state, used as a basis for acquiring Mississippi property, makes the Mississippi property community property, or its legal effect, also.
The facts found by the Court show that all of the assets of the parties were acquired during the marriage of the parties. Some of these assets were the basis for the source of funds for the acquisition of the Mississippi property. The balance of the assets have been divided by mutual agreement of the parties.
Defendant contends that the use of property which can be termed "community property" under Louisiana law, one, creates a constructive or resulting trust; or, two, entitles her to an equitable distribution of one-half of the property, under Mississippi law.
Kathy's participation is these business ventures is minimal. Her claim to any interest comes solely as result of her being Richard's wife, and, as such, being entitled to certain benefits under the community property laws of Louisiana.
First, is Kathy entitled to an equitable distribution of one-half of the Mississippi properties?
Retzer v. Retzer, 578 So.2d 580 (Miss. 1991), outlines some factors to be considered by the Court in determining equitable distribution of the properties acquired during the marriage.
This was a "long" marriage of the parties. Although only ten years, it lasted for most of their adult life.
Did Kathy make a substantial contribution to the accumulation of the total wealth of the parties? She was involved in no way in Palmer Petroleum, nor did the quitting of her job as an assembly line worker in anticipation of marriage contribute to the business. She became a housewife, but that was by choice and was in no way related to the business or needs of the family.
*16 After the divorce will her separate income and estate be meager compared to the husbands, or, will she lack financial security because of the divorce? Both tests must be answered in the negative. She has a separate estate, as a result of the property settlement, and separate income of approximately $8,000 per month. She is capable of making $2,000 per month as a registered nurse. In addition, she receives $2,700 per month as child support.
Finally, the separation and divorce was the "legal fault" of Kathy.
Under Retzer, supra; Watts v. Watts, 466 So.2d 889 (Miss. 1989); and Jones v. Jones, 532 So.2d 574 (Miss. 1988), the Court finds that Kathy did not make any contribution to the accumulation of the wealth of these parties. In fact, from the evidence, the major factor in the accumulation of this wealth is the fact that Ricky Palmer is the son of John Palmer. All doors were opened as a result of this relationship.
Is Kathy entitled to one-half of the property as a result of a constructive or resulting trust? In determining whether a constructive or resulting trust exists, the Courts generally apply a standard set forth concisely in Russell v. Douglas, 243 Miss. 497, 138 So.2d 730, (1962):
A constructive trust is fiction of equity. It is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that a holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. The equity must shape the relief and courts are bound by no unyielding formula ... It arises regardless of intention or agreement, express or implied ... The trust is raised by implication of law. Fraud need not be shown.
A resulting trust is "merely a subspecies of constructive trusts" and "there is no essential difference between the equities necessary to generate a resulting trust as compared with a constructive trust." Allgood v. Allgood, 473 So.2d 416 (Miss. 1985). Clear and convincing proof is necessary to establish a resulting or constructive trust. Allgood v. Allgood, supra.
Kathy asks the Court to apply this law to the Mississippi property. Her argument is that the source of all assets necessary to acquire the Mississippi property were, under Louisiana law, community property and, therefore, she contributed one-half of funds to acquire the Mississippi property.
The Court looks to the Louisiana law to determine the interest of Kathy in the funds. Newman v. Newman, 558 So.2d 821 (Miss. 1990). The assets used to fund the acquisition of the Mississippi property were, in this Court's opinion, community property under Louisiana law.
Does the next step follow automatically? That is, do all properties acquired by Ricky, wherever situated or located, community property state or not, by operation of law become jointly owned? Is all of his property in non-community property states also community property?
This case involves real property purchased in Mississippi in Ricky's name only. It does not involve personal property acquired in a community property state and later removed to another non-community property state. Ricky, in effect, either borrowed against community property and invested in a non-community property state, or used the income from community property to invest. Even under Louisiana law one-half of those amounts were his and remained his after the property settlement. Was his portion of the community property forever contaminated? Could he not purchase non-community property elsewhere?
In Stone v. Sample, 216 Miss. 287, 62 So.2d 307 (Miss. 1953), a tax case involving a joint return, the Mississippi Supreme Court seemed to say that all property would be community property. In that case, however, both parties admitted that the wife owned one-half of the property. Newman v. Newman, supra, involved a retirement account earned in a community property state.
Louisiana courts seem to recognize that the community does not follow to other states. Pennison v. Pennison, 157 So.2d 628 *17 (La.Ct. of Appeals, 1963) puts the problem as follows:
The property in Waveland, Mississippi, was bought by the husband in his own name for the sum of $600 in cash taken out of the community funds. This property belongs to his separate estate. The common law prevails in Mississippi, and to that system of law the community of acquets and gains between the spouses is unknown ... Our community laws of Louisiana do not operate on real estate in another state or country ... This property forms no part of the community, but the community should be regarded as the husband's creditor for the advance of $600 with which he paid the purchase price.
Although Kathy's brief cites authorities criticizing the Pennison case, no showing was made that the case has been overruled in Louisiana. This case stands for the important proposition that the Louisiana courts do not interpret the community property laws to be as far reaching as Kathy contends.
It is the opinion of this Court that the better policy is to follow the Pennison theory and apply the Mississippi law to Mississippi property. To accept Kathy's theory would make the acquisition of Mississippi property by Louisiana residents subject to the community property laws of Louisiana. Consider this proposition: A couple lives in a community property state such as Louisiana for part of their married lives and in a separate property state such as Alabama for the balance of the marriage. The husband acquires real estate in Mississippi. While the couple are residents of Alabama, he decides to sell his Mississippi property. Does the lawyer examining the title have to take a history of the marriage, and the couple's finances, to determine whether or not the wife has an interest in the Mississippi property because it may have been acquired with assets earned while living in Louisiana? It certainly would place an unmanageable burden on examiners of real estate title. The wife does not lose entirely, however. She becomes a creditor of the husband's estate for all funds withdrawn from the community. The Louisiana law of acquets and gains just does not apply to the Mississippi real property.
Having reviewed all of the evidence and the briefs of counsel the Court concludes, and so finds, that under Mississippi law Kathy Ann Peek Palmer is not entitled to an equitable distribution of the Mississippi property and that she acquired no title to the property by a resulting or constructive trust, and that any claim of hers to the title of Richard Warren Palmer should be cancelled and held for nought.
Plaintiff's attorneys should prepare and submit a judgment in accordance with this opinion.
NOTES
[1] See the chancellor's Opinion of the Court and Findings of Fact attached hereto.